# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3809

FRIENDS OF MILWAUKEE'S RIVERS and
LAKE MICHIGAN FEDERATION,

*Plaintiffs-Appellants*,

*v.*

MILWAUKEE METROPOLITAN SEWERAGE
DISTRICT,

*Defendant-Appellee*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-0270 — **Charles N. Clevert, Jr.**, *Judge*.

———————

ARGUED MARCH 29, 2004—DECIDED SEPTEMBER 2, 2004

———————

Before CUDAHY, ROVNER and DIANE P. WOOD, *Circuit Judges*.

CUDAHY, *Circuit Judge*.   For decades, the defendant Milwaukee Metropolitan Sewerage District (MMSD) and its predecessor organization have, for various reasons, occasionally discharged untreated sewage directly into Lake Michigan and Milwaukee's rivers. The discharges were reduced in number and volume after MMSD's system's capacity was expanded by the Deep Tunnel, which was completed in 1994. However, discharges from sanitary sewers (which

violate the Clean Water Act and MMSD's discharge permit) have persisted despite expectations that the Deep Tunnel would virtually eliminate them.

The plaintiffs, Friends of Milwaukee's Rivers and the Lake Michigan Federation (collectively, the plaintiffs), perceived a lack of action by the State of Wisconsin and MMSD to eliminate these persistent sanitary sewer discharges. In 2001, the plaintiffs filed a notice of intent to bring a citizens' suit under the Federal Water Pollution Control Act (the Clean Water Act or the Act), 33 U.S.C. §§ 1251 *et seq.*, and in the early hours of March 15, 2002, they brought suit in federal court. The State of Wisconsin also filed suit later on the same day in Milwaukee County court, and within a few months, it reached a settlement with MMSD. The centerpiece of the consent agreement resulting from the Milwaukee County action provided for additional expenditures of more than $900 million on several projects to further increase the capacity of MMSD's sewer system.

MMSD subsequently moved to dismiss the plaintiffs' federal suit as barred because the State of Wisconsin had taken judicial and administrative enforcement actions to diligently prosecute its violations of the Act. The district court, finding that the State of Wisconsin had indeed diligently prosecuted the violations alleged by the plaintiffs, dismissed for lack of subject matter jurisdiction because the suit was barred by the terms of the Clean Water Act. In the alternative, the district court found that the plaintiffs' suit would be barred by res judicata. The plaintiffs appeal both of these findings, and for the reasons that follow, we reverse.

## I.  Background

MMSD is a state-chartered government agency providing wastewater services to 28 municipalities in southeast Wisconsin. MMSD's 420-square-mile service area includes

all cities and villages within Milwaukee County (except the City of South Milwaukee), and all or part of 10 munici-palities or sanitary districts in the surrounding counties of Ozaukee, Washington, Waukesha and Racine. Two types of municipality-owned sewer systems feed into MMSD's interceptor sewers: separate sewers and combined sewers. Separate sewers have separate pipes for storm water (which empties directly into area waterways) and sanitary waste (which empties into MMSD's system where it can be treated). Combined sewers, which are mostly older sewer systems, are designed to carry both storm water and sani-tary waste in the same pipes.[1] MMSD's discharge permit

---

[1] There are advantages and disadvantages to combined sewer systems. The disadvantages were dramatically illustrated during the month of May 2004, when heavy rainfall resulted in the dumping of "an unprecedented 4.6 *billion* gallons of raw sewage" directly into Lake Michigan and Milwaukee area streams and rivers. Marie Rohde and Steve Schultze, *Sewage Dumped in May: 4.6 Billion Gallons*, MILWAUKEE J. SENTINEL, May 29, 2004, at 1A (emphasis added). The State accused MMSD of multiple violations for the portion of the 4.6 billion gallons attributable to separated sewers carrying only sanitary waste, which accounted for 500 million gallons. *See* Steve Schultze and Marie Rohde, *Sewerage District Denies Blame*, MILWAUKEE J. SENTINEL, July 3, 2004, at 1B. The remaining 4.1 billion gallons were attributable to discharges from combined sewer systems. Wisconsin's Department of Natural Resources has recently referred MMSD (along with 29 southeast-ern Wisconsin communities) to Wisconsin's Department of Justice for possible civil litigation. *See* Larry Sandler, *DNR Calls for Legal Action in MMSD Dumps*, MILWAUKEE J. SENTINEL, August 3, 2004, at 1B.

The advantages of combined sewer systems may be less obvious but should still be mentioned. In MMSD's combined sewer system, the often highly-contaminated runoff from most rainstorms and snowstorms is captured in the system and treated before being discharged. This allows Lake Michigan to be spared from "vast

(continued...)

prohibits overflows from separate sanitary sewers except in very limited situations, though up to six discharge events are allowed annually from combined sewers as long as Lake Michigan's water quality does not suffer. (MMSD's Supp. Appx. at 142.)

Nearly thirty years ago, the State of Wisconsin (State)[2] entered into a stipulation (1977 Stipulation) with the predecessor organization of the defendant, MMSD. This stipulation resolved litigation that had commenced in 1976 in the Dane County Circuit Court over violations of MMSD's

---

[1] (...continued)
amounts of road salt, heavy metals, oil and grease" in all but the heaviest storms. George Meyer, *Separating Sewers Won't Do the Job*, MILWAUKEE J. SENTINEL, June 20, 2004, at 3J. Discharges from combined sewers are also diluted with storm water, which is estimated by WisDNR to make up 90% of overflows, while discharges from separated sewers involve undiluted sewage. *See id.*; Lee Bergquist, *Lake Can Take Some Pollution, But Experts Still Worry About Overflows, Runoff*, MILWAUKEE J. SENTINEL, July 12, 2004, at 1A.

[2] Wisconsin has a "stepped" enforcement process that begins with meetings between the Department of Natural Resources (WisDNR) and the violator or with the issuance of a warning letter (Notice of Non-Compliance). (Plaintiffs' Supp. Appx. at 278.) If the conditions causing the violation are not resolved, WisDNR can issue a formal notice of violation. *Id.* If the violator does not take corrective action, WisDNR refers the matter to the Wisconsin Department of Justice (WisDOJ) to initiate judicial action with which WisDNR remains involved. (MMSD's Br. at 39.) For ease of reference, when discussing judicial and administrative actions taken by Wisconsin state agencies against entities that violate the Act, we will refer to the Wisconsin Department of Natural Resources (WisDNR), the Wisconsin Attorney General and the Wisconsin Department of Justice (WisDOJ) generically as "the State." In other contexts and as necessary, the agencies will be referred to individually.

Wisconsin Pollutant Discharge Elimination System (WPDES) permit. The 1977 Stipulation acknowledged more than 60 historic violations of MMSD's WPDES permit and the Federal Water Pollution Control Act (the Clean Water Act or the Act), 33 U.S.C. §§ 1251 *et seq.*, but it did not require MMSD to pay any penalties or fines. Instead, MMSD was required to spend nearly $2 billion over the following 20 years on improvements to several woefully substandard aspects of MMSD's sewage treatment system. The main improvement was a "Deep Tunnel," which came on line in 1994. The Deep Tunnel increased the system's capacity by allowing up to 405 million gallons of untreated sewage to be temporarily stored during periods of heavy rain and then pumped back into MMSD's treatment facilities and treated before being discharged. Heavy rainfall taxes the system's capacity due to Milwaukee's combined sewers as well as improperly connected downspouts/drainage and leaks in the system that allow runoff and ground water to infiltrate. Although the Deep Tunnel undeniably has reduced the number and volume of both sanitary sewer overflows (SSOs) and combined sewer overflows (CSOs), it has not fulfilled its intended goal of virtually eliminating SSOs. (Plaintiffs' Sep. Appx. at 211.) Contrary to expectations, there have been an average of 4.9 SSOs and 3.0 CSOs annually since the Deep Tunnel went into effect (some of which were not related to the Deep Tunnel), resulting in discharges by MMSD totaling 936.7 million gallons and 12.3 billion gallons respectively since 1994 (as of a 2002 audit). *Id.* at 212.

The plaintiffs grew concerned about these continuing discharges and the State's apparent lack of enforcement action. On July 11, 2001, they sent to MMSD the required notice of intent to bring a citizens' suit under the Clean Water Act for violations of MMSD's discharge permit that had occurred after the Deep Tunnel came on line, with copies to all necessary state and federal agencies. (Plaintiffs'

Sep. Appx. at 105-09.) Five days later, the State notified MMSD that several of the SSOs identified in the plaintiffs' letter were violations of MMSD's WPDES permit and the Act. One day prior to the expiration of the 60-day notice period prescribed by the Act, the State and MMSD filed a stipulation (2001 Stipulation) with the Dane County Circuit Court as part of the 1976 litigation. Neither the plaintiffs nor the public were provided any opportunity to comment on the 2001 Stipulation prior to its filing. The 2001 Stipulation required MMSD, at an estimated total cost of $907 million, to complete three new deep tunnel projects (increasing storage capacity by an additional 116 million gallons, or 30%), to complete all activities contemplated by the approved 2010 Facilities Plan by various fixed dates, to complete planning for the 2020 Facilities Plan by a fixed date and to complete and implement a Capacity, Management, Operation and Maintenance (CMOM) self-auditing program.[3] (MMSD's Br. at 13.) However, the Dane County judge refused to approve the 2001 Stipulation, saying, "It does seem to me that at some point a court's involvement in a case must end. It also seems to me that this case has gone well beyond that point." (Plaintiffs' Short Appx. at 9.[4])

Subsequently, the State and MMSD agreed to meet with the plaintiffs to discuss their concerns about the proposed

---

[3] MMSD notes that the Environmental Protection Agency acknowledges that "even municipal collection systems operated in an exemplary fashion may experience unauthorized discharges under exceptional circumstances." (MMSD's Br. at 10 n.4.) Also, the EPA recently advocated reduction or elimination of penalties for municipalities that adopted the CMOM program. *Id.* However, the Milwaukee Journal Sentinel recently reported that a top EPA official characterized MMSD as "the worst dumper on Lake Michigan and among the worst on the Great Lakes." Schultze and Rohde, *supra* note 2, at 1B.

[4] For ease of reference, citations to the Plaintiffs' Short Appendix will be designated by "PSA at __."

2001 Stipulation. The State agreed, at the plaintiffs' request, to hold off filing suit against MMSD until March 15, 2002, while settlement negotiations took place. (MMSD's Br. at 14.) However, the agreement failed to include a provision that the State be allowed to file first on that date. After the negotiations failed, the plaintiffs filed their suit at 7:57 a.m. on March 15, 2002 in the Eastern District of Wisconsin, alleging 165 SSOs from various locations during the period from January 1, 1995 to September 25, 2001. Later that same day, the State filed suit in Milwaukee County Circuit Court, counting the same 165 SSOs as 13 SSO events in accordance with the terms of MMSD's permit and finding eight of the 13 to be violations of MMSD's permit and three to require additional investigation. (MMSD's Br. at 15 n.6; PSA at 7.) The plaintiffs, under Wisconsin law, could have requested to intervene in the State's suit but did not do so. Wis. Stat. § 803.09.

On May 29, 2002, while the plaintiffs' suit was pending, the Milwaukee County Circuit Court, at the request of the State and MMSD, entered a stipulation (2002 Stipulation) that settled the State's lawsuit. The 2002 Stipulation was "substantially the same" as the 2001 Stipulation: although the compliance schedule had been compressed, the scope of the work remained the same. (MMSD's Br. at 16.) The plaintiffs have several problems with the 2002 Stipulation, the main problem apparently being the lack of any penalties for past violations or provisions for penalties in the event of future violations, though other flaws are mentioned. (*See*, *e.g.*, Plaintiffs' Br. at 13-14, 32; MMSD's Supp. Appx. at 87-95.) The 2002 Stipulation, like the 2001 Stipulation, requires MMSD to undertake various improvement projects which will cost taxpayers $907,000 through 2010. It also rescinded the 2001 Stipulation that the State and MMSD had previously filed.

Shortly thereafter, MMSD moved to dismiss the plaintiffs' complaint. An Audit Report subsequently released by the

Wisconsin Legislative Audit Bureau (2002 Audit Report) (Plaintiffs' Sep. Appx. at 205-301) highlighted several factors contributing to MMSD's continuing CSOs and SSOs, including large storms in recent years; capacity issues in the Deep Tunnel and MMSD's sewers and treatment facilities; and operational policies that have exacerbated overflows. *Id.* at 231. But the district court nonetheless found that the State had commenced and diligently prosecuted judicial and administrative actions against MMSD, resulting in a lack of subject matter jurisdiction that barred the plaintiffs' citizens suit from proceeding. In the alternative, the district court found that *res judicata* would bar the litigation. The plaintiffs now appeal both of these findings.

## II.  Discussion

The plaintiffs brought this suit seeking a declaratory judgment, injunctive relief, civil penalties and costs and fees under the citizens' suit provision of the Clean Water Act. The district court had federal question jurisdiction pursuant to § 505(a) of the Act. 33 U.S.C. § 1365(a); 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a final judgment dismissing this case due to a lack of subject matter jurisdiction.

We review de novo the district court's dismissal of the plaintiffs' suit for lack of subject matter jurisdiction. *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). In considering a motion to dismiss for lack of subject matter jurisdiction, we must accept the complaint's well-pleaded factual allegations as true and must draw all reasonable inferences from those allegations in plaintiffs' favor as the non-moving party. *Id.* We also employ the de novo standard in reviewing the dismissal of an action on res judicata grounds. *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 527 (7th Cir. 1999).

The Clean Water Act provides that "any citizen may commence a civil action on his own behalf—(1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this [Act]." 33 U.S.C. § 1365(a). Pursuant to the Act, no action may be brought "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." *Id.* at § 1365(b)(1)(A). Citizens are also barred from bringing suit "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order." *Id.* at § 1365(b)(1)(B). In addition, any violation "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to" the subsection of the Act addressing administrative actions "shall not be the subject of a civil penalty action." 33 U.S.C. § 1319(g)(6)(A). However, this limitation is inapplicable to a citizens' suit that is filed before the State commences administrative action. *Id.* at § 1319(g)(6)(B).

Here, the plaintiffs gave the required written notice to MMSD, to the United States Environmental Protection Agency (United States EPA) and to the State of its intent to sue, and the plaintiffs' complaint was filed more than 60 days after notice was given. Whether the State had "commenced and [was] diligently prosecuting a civil . . . action" or administrative action at the time the plaintiffs filed suit, and if not, whether res judicata nonetheless bars the plaintiffs' suit, are the issues we must resolve.

## A. Did WisDNR timely commence and diligently prosecute a civil or administrative action?

In determining whether the plaintiffs' suit was barred under § 1365(b)(1)(B), the district court discussed three of

the State's judicial actions: the 1977 Stipulation (which arose out of the 1976 litigation and addressed earlier violations); the 2001 Stipulation (which was filed as an attempted continuation of the 1976 litigation to address the violations alleged by the plaintiffs but was not accepted by the Dane County court and was later rescinded by the 2002 Stipulation); and the 2002 Stipulation (which ended litigation that had been filed in Milwaukee County court later on the same day that the plaintiffs filed suit in district court). The district court also examined whether administrative actions undertaken by the State barred the plaintiffs' suit for civil penalties under § 1319(g). We will consider in turn each of these four hurdles facing the plaintiffs.

### 1.   The 1976 litigation and 1977 Stipulation

No one disputes (or could dispute) that the 1976 litigation in Dane County and the resulting 1977 Stipulation occurred or were commenced before the plaintiffs' suit was filed nearly 25 years later. However, whether these actions also qualify as a diligent prosecution of violations that occurred after all work contemplated under the 1977 Stipulation had been completed is another matter. The plaintiffs argue that the 1977 Stipulation was over and done with by 1996 at the latest. But even if we assume that the 1976 action were still "open" to receive the filing of the 2001 Stipulation, the 1977 Stipulation could not qualify as a diligent prosecution of the violations alleged by the plaintiffs since the projects mandated by the 1977 Stipulation obviously did not prevent those violations from occurring.

Whether the 1976 litigation and 1977 Stipulation constituted a diligent prosecution of the historical violations that had occurred prior to the 1976 litigation and the contemplated violations that were going to continue to occur until work was completed under the 1977 Stipulation is not

at issue here. Logically, however, the 1976 litigation and 1977 Stipulation cannot constitute diligent prosecution of violations that have occurred (or continued to occur) after all work under the 1977 Stipulation had been completed. If the violations alleged by the plaintiffs occurred because of lingering problems that the 1977 Stipulation failed to resolve, the 1977 Stipulation cannot have been a diligent prosecution of the circumstances causing those violations. If, on the other hand, the violations alleged by the plaintiffs occurred because of circumstances unrelated to those that the 1977 Stipulation was intended to comprehensively address, then the 1976 action cannot possibly have been a diligent prosecution of violations due to circumstances unknown and unlitigated at that time. Either way, the 1976 litigation and 1977 Stipulation do not amount to diligent prosecution of the violations alleged by the plaintiffs.

### 2.   The 2001 Stipulation

The 2001 Stipulation was filed as part of the 1976 litigation in Dane County Circuit Court *before* the 60-day notice period had expired and *before* the plaintiffs filed their suit. But the Dane County judge refused to enter the 2001 Stipulation, and the parties later rescinded it by the 2002 Stipulation, which was entered as part of a separate action instituted in Milwaukee County Circuit Court. The district court concluded that the Dane County court had retained jurisdiction over the 1977 Stipulation and that the 2001 Stipulation was a diligently prosecuted continuation of the same action. The plaintiffs argue that the Dane County court lacked continuing jurisdiction because all work contemplated under the 1977 Stipulation was long completed and that the flaws in the 2001 Stipulation render it non-diligent.

With respect to the timeliness of the action, if the State had chosen to file a brand new *lawsuit* rather than a new

consent order in a very old lawsuit, that lawsuit would have been timely commenced. And if the Dane County judge had approved the 2001 Stipulation after it was filed, the 2001 Stipulation would also have been a timely commenced judicial enforcement action. The fact that the 2001 Stipulation was never approved by the court and was later rescinded does not affect its *timeliness*, which is determined by the date of filing.[5] *Connecticut Fund for the Environment, Inc. v. Upjohn Co.*, 660 F. Supp. 1397, 1404 (D. Conn. 1987) ("[T]he court must apply an inflexible rule which determines jurisdiction from the time of filing the complaint."). But the court's non-approval *does* render the 2001 action a non-diligent prosecution.[6] Even though the 2001 Stipulation may have been *intended* to address "dry and wet weather

---

[5] For the purposes of deciding whether the 2001 Stipulation was a timely commenced action, under circumstances such as these, we are reluctant to use the initiation of an older judicial action to back-date the commencement of an action under the Clean Water Act as suggested by MMSD. (MMSD's Br. at 27-28.) If a state agency were allowed to indefinitely continue an enforcement action so as to ensure that it always has on the back burner a court action that has been "commenced" before any later citizens' suit could be filed, that arrangement would eviscerate the timely commencement requirement because the agency could wait as long as it liked before responding to any citizens' suit. Using the earlier commencement date might also indicate a lack of diligence in resolving problems known about for years. *See New York Coastal Fisherman's Ass'n v. New York City Dept. of Sanitation*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991) (finding that prosecution was not diligent where orders were amended to extend deadlines and a target completion date of 1995 was "simply too long to rectify a problem that has been known about since 1983"). Here, the 2001 Stipulation was filed before the 60-day window expired or a citizens' suit was filed and was therefore timely.

[6] It is also troubling that the 2001 Stipulation was filed without opportunity for notice and comment by the public, including the plaintiffs.

overflows, and mandate[ ] three extensions to the Deep Tunnel" (PSA at 19), the fact that the Dane County judge refused to enter the 2001 Stipulation (whether on a jurisdictional basis or otherwise) robbed that Stipulation of any legally binding effect. Even if the 2001 Stipulation had bound the parties, it was rescinded a few months later by the 2002 Stipulation, which resolved a separate judicial action filed in a different court. The fact that the 2002 Stipulation was very similar to the 2001 Stipulation does not equip the 2001 Stipulation with the teeth required to qualify on its own as a diligent prosecution. A judicial action that never resulted in any legally binding agreement to resolve the violations alleged by the plaintiffs (and was rescinded before MMSD took any actions toward complying with it) is not a diligent prosecution.

### 3.  The 2002 litigation and 2002 Stipulation

The plaintiffs argue that a timely commenced action must be filed prior to a citizens' suit in order for it to have potentially preclusive effect under the Act. Since the plaintiffs filed their suit several hours before the state's suit was filed, they argue that the State's 2002 litigation was not timely commenced. MMSD counters that the State agreed to postpone filing its complaint until March 15, 2002 at the plaintiffs' request, in order to give the parties a chance to negotiate a satisfactory resolution. The parties did not incorporate into their agreement to postpone filing their lawsuits any provision governing which party would be considered to have filed first. The district court did not weigh in on this issue, finding that the State's 2002 suit was filed several hours after the plaintiffs' suit, and apparently concluding that it could not qualify as a timely commenced judicial action. (PSA at 21.)

We are relieved to note that races to the courthouse to file Clean Water Act complaints, such as the one which took place

here, are rare, though the caselaw relating to such situations is correspondingly sparse. When there has been an agreement between the parties that the citizens would file first, the citizens' suit has been held not to be barred by a suit filed by the state agency later the same day. *Chesapeake Bay Found. v. Am. Recovery Co.*, 769 F.2d 207, 207-08 (4th Cir. 1985). Similarly, where the state agency had asked the citizens to postpone filing their suit, the earlier-filed citizens' suit was not barred. *Long Island Soundkeeper Fund, Inc. v. New York City Dep't of Envtl. Prot.*, 27 F. Supp. 2d 380, 382-83 (E.D.N.Y. 1998). MMSD argues that these cases are inapposite here because the State postponed filing its suit at the plaintiffs' request and not the other way around. However, these decisions (and others) arrived at their holdings by employing a literal, inflexible interpretation compelled by the clear and unambiguous language of the Act. *See Chesapeake Bay Found.*, 769 F.2d at 208 ("This latter statutory bar is an exception to the jurisdiction granted in subsection (a) of § 1365 and jurisdiction is normally determined as of the time of the filing of a complaint. Moreover, the verb tenses used in subsection (b)(1)(B) and the scheme of the statute demonstrate that the bar was not intended to apply unless the government files suit first (and is diligently prosecuting such suit)."); *Long Island Soundkeeper Fund*, 27 F. Supp. 2d at 383 ("The language of this statute 'clearly contemplates action prior to the filing of a citizen suit.'") (internal citation omitted); *Connecticut Fund for the Env't*, 660 F. Supp. at 1404 ("[T]he court must apply an inflexible rule which determines jurisdiction from the time of filing the complaint."). We are not inclined to add our encouragement to a race to the courthouse. Nor do we wish to discourage state agencies from attempting to resolve disputes through negotiation with citizens' groups. But the clear and unambiguous language of § 1365(b)(1)(B) and its uniform interpretation by the courts on a jurisdictional point dictate a conclusion that the State's 2002

litigation (and resulting 2002 Stipulation) cannot qualify as a timely commenced action barring the plaintiffs' suit.[7]

Any similarity of the 2002 Stipulation to an ineffective stipulation that was timely filed in a different suit in a different court (i.e., the 2001 Stipulation) does not alter the outcome. Thus, we find that the State's judicial action resulting in the 2002 Stipulation was commenced when the Milwaukee County suit was filed after the plaintiffs' suit was filed on March 15, 2002, not when the 2001 Stipulation was filed (or earlier). Any other conclusion would allow state agencies to file "placeholder" lawsuits or consent decrees to ensure timely commencement and then to grapple with the problem at their (relative) leisure, subject only to the diligent prosecution requirement (which, as the district court noted, is a deferential standard). Since the Milwaukee County action does not meet the timely commencement requirement, it cannot bar the plaintiffs' citizens' suit under § 1365(b)(1)(B), whether it is diligent or not. We will address the question whether the 2002 Stipulation represents a diligent prosecution of the violations alleged by the plaintiffs later, in our discussion of res judicata.

### 4. WisDNR's administrative actions

As the Eleventh Circuit has recently noted,

[c]ourts that have addressed § 1319(g)(6)(A)(ii)—the "diligent-prosecution bar"—have interpreted the statute to bar citizen suits when three requirements are satisfied. First, the state must have "commenced" an enforcement procedure against the polluter. Second, the state must be "diligently prosecuting" the enforcement proceedings.

---

[7] We note that the State could have avoided this outcome by incorporating a "first to file" provision into its agreement with the plaintiffs to postpone filing any suit until March 15, 2002.

> Finally, the state's statutory enforcement scheme must be "comparable" to the federal scheme promulgated in 33 U.S.C. § 1319(g).

*McAbee v. City of Fort Payne*, 318 F.3d 1248, 1251 (11th Cir. 2003). In finding that the State's administrative enforcement actions barred the plaintiffs' suit under § 1319(g), the district court here referred to such actions as meetings between the EPA and WisDNR, between WisDNR and MMSD and between all three entities (PSA at 5, 6); information requests by WisDNR that MMSD had to comply with (PSA at 6); projects outlined by WisDNR for MMSD to "focus on initially" (PSA at 7); investigation of overflow events between February and July 2001 (*id.*); the issuance of an informal notice of non-compliance to MMSD shortly after the plaintiffs' notice of intent to sue was received (*id.*; *see also* Plaintiffs' Br. at 33-34 (noting that until the State filed its suit on March 15, 2002, it had never escalated its "stepped" enforcement policy beyond the first level, which is the issuance of an informal notice of non-compliance)); meetings between MMSD and WisDNR in August 2001 "to negotiate a corrective action plan" (PSA at 8); and the "formal referral of the matter" to WisDOJ, which subsequently filed the 2001 Stipulation in Dane County court (PSA at 8-9). Although these actions undeniably resulted in the eventual filing of the Milwaukee County action and the 2002 Stipulation, they do not themselves qualify as the commencement of an administrative enforcement action that would serve to bar the plaintiffs' suit.

"Commencement" with respect to an administrative action is not defined by the Act, and we have not previously had the opportunity to weigh in on this issue. Other courts have found that the filing of an administrative consent order prior to the filing of a citizens' suit would in most cases qualify as the sort of administrative action that would bar

a citizens' suit for civil penalties.[8] But if the consent order comes after the citizens' suit is filed, the citizens' suit may proceed. *See Altamaha Riverkeepers v. City of Cochran* 162 F. Supp. 2d 1368, 1373 (M.D. Ga. 2001) (finding that proposed consent order and fines that came after citizens' suit was filed did not bar suit). The Eighth Circuit has implied that issuance of a formal Notice of Violation could also qualify as the commencement of an administrative enforcement action if it triggers notice and hearing procedures designed to protect and give access to the public and interested parties. *Cf. Arkansas Wildlife Fed'n*, 29 F.3d at 379-80. Letters and conferences where no public notice was given and that did not result in hearings have been found not to bar a citizens' suit. *See Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*, 734 F. Supp. 667, 669-70 (M.D. Pa. 1989) (finding state environmental department's unsigned letter to alleged water discharge permit violator setting administrative conference for which no public notice was provided and at which no hearing was held did not bar citizens' suit); *cf. PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 618-19 (7th Cir. 1998) (noting in context of the bar Resource Conservation and Recovery Act (RCRA) places on citizens' suits when judicial action

---

[8] *See McAbee*, 318 F.3d at 1251 n.6 ("[M]ost courts that have addressed the issue have concluded that issuance of an administrative consent order . . . would satisfy the 'commencement' requirement."); *Arkansas Wildlife Fed'n v. ICI Ams.*, 29 F.3d 376, 380 (8th Cir. 1994) (concluding that filing administrative consent order counted as "commencement" because interested third parties had right to intervene and certain notice and hearing procedures became available); *Public Interest Research Group, Inc. v. Elf Atochem N. Am., Inc.*, 817 F. Supp. 1164, 1173 (D.N.J. 1993) ("Order and Notice, issued pursuant to state regulations specifically providing for due process protections in the initiation of enforcement proceedings, was the actual initiation or 'commencement' of an enforcement proceeding").

has been commenced, that "[w]riting a letter would hardly be described as 'commencing' or 'prosecuting' an 'action' . . . , especially when we consider the interminable character of much administrative process and the difficulty of deciding on a threshold below which the process is too tentative to justify barring a citizen's suit") (citations omitted).

Discerning from these various decisions the contours of the law, we conclude that with respect to administrative enforcement actions, the "commencement" of the action is tied in with the "comparability" of the state statute to the federal provisions. Specifically, we hold that for the purposes of § 1319(g), an administrative action "commences" at the point when notice and public participation protections become available to the public and interested parties. Because Wisconsin law does not authorize administrative penalty proceedings or fines, there are no administrative enforcement provisions "comparable" to those of the Clean Water Act. Rather, when WisDNR decides that a violation requires enforcement, Wisconsin law provides that WisDNR "shall refer the matter to [WisDOJ] for enforcement," and WisDOJ "shall initiate the legal action requested by" WisDNR. Wis. Stat. § 283.89(1)-(2). MMSD admits that Wisconsin's permissive intervention statute is triggered only when the administrative enforcement advances to the stage at which a legal action is filed. (MMSD's Br. at 39.) Thus, in Wisconsin, the "formal moment" at which an action is commenced is when WisDOJ files a complaint with state or federal court because "[f]rom this formal moment enforcement becomes public." *Wisconsin Envtl. Law Advocates v. Wisconsin Power & Light Co.*, 03-C-0739-S, at 17 (W.D. Wis. May 3, 2004).

We conclude that the non-judicial actions taken by the State did not commence an administrative action barring the plaintiffs' suit under § 1319(g), because at no point prior to the filing of the Milwaukee County suit did the state's administrative enforcement procedures contemplate public

notice and participation. Although the filing of the 2001 Stipulation was a judicial action, there was no opportunity provided for public notice or participation. Moreover, as we noted earlier, the 2001 Stipulation was not a diligently prosecuted action because it was not legally binding and was withdrawn by the 2002 Stipulation. And the Milwaukee County action was filed too late. Because the State did not timely "commence" and diligently prosecute an administrative enforcement action, the plaintiffs' suit for civil penalties is not barred by § 1319(g). And, as we have already concluded, the plaintiffs' suit is not barred under § 1365(b)(1)(B) by any of the State's judicial enforcement actions.

## B.  Res judicata

The district court found that the 2002 Stipulation "is drafted to resolve all potential liability for the alleged sanitary sewer overflows occurring after 1994 and bring MMSD into compliance with the WPDES permit." (PSA at 24.) It went on to conclude that, in addition to being barred under the Act by prior actions taken by the State, the plaintiffs' suit would also be barred under res judicata. According to Wisconsin law,

> [u]nder the doctrine of claim preclusion, a subsequent action is barred when the following three factors are present: (1) identity between the parties or their privies in the prior and present suits; (2) prior litigation resulted in a final judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits.

*Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 233-34 (Wis. 1999).

The plaintiffs do not challenge that the second element has been established. They do, however, challenge whether the plaintiffs' causes of action were the same as those

brought by the State in the Milwaukee County action and whether MMSD has demonstrated that the State was in privity with the plaintiffs.

### 1.   Identity of causes of action

Wisconsin takes a "transactional" approach to determining whether there is an identity of causes of action. *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 550 (1995). "What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, [and] whether they form a convenient trial unit . . . ." *Id.* at 554.

The plaintiffs argue that their suit is broader and different in scope than the State's 2002 suit in Milwaukee County. The plaintiffs point to specific differences, including their allegations of violations from 165 locations (as opposed to on 8 occasions); a higher volume of unpermitted discharges (900 million gallons as opposed to 471 million gallons); dry weather discharges from sanitary sewers; MMSD's "consistent operational and management problems that have significantly contributed to the exceedingly high number and volume of unpermitted discharges" (Plaintiffs' Br. at 44); and additional violations, including one in August 2002 involving 412 million gallons of sewage that was not covered by the 2002 Stipulation (which resolved MMSD's liability for all SSOs "to the latest date upon which either of the parties executes this agreement" (*id.* at 45)).

All of the plaintiffs' purported pre-Stipulation differences are swallowed up by the 2002 Stipulation's broad scope. The 2002 Stipulation was intended to "present[ ] a comprehensive solution to sanitary sewer overflows, regardless of their cause, including but not limited to wet weather events, equipment malfunctions, and operator error." (Plaintiffs' Sep. Appx. at 178-79.) It purported to relieve MMSD from

liability for *all* violations up to the date the 2002 Stipulation was executed, including those that were not specifically alleged in the State's complaint. Thus, there is an undeniable identity of causes of action with respect to the pre-Stipulation violations.

As for post-Stipulation violations, there are two reasons why the unspecified ongoing or continuing violations alleged in the plaintiffs' complaint do not constitute a separate and distinct cause of action. First, the Act itself bars the bringing of any action "prior to sixty days after the plaintiff *has given notice of the alleged violation*" to various parties. 33 U.S.C. § 1365(b)(1)(A) (emphasis added). This notice must contain "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation." 40 C.F.R. § 135.3(a). As the Supreme Court has noted, the purpose of this notice is twofold: it "allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits," and it "gives the alleged violator 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989) (internal citation omitted). Even if the unspecified violations, such as the August 2002 violation, were sufficiently well-pleaded by references to "ongoing" or "continuing" violations, they were not mentioned in the required notice and would therefore be barred by the Act, at least as part of this particular suit.

The second reason why the unspecified post-Stipulation violations are not separate and distinct causes of action is that the 2002 Stipulation was intended to address the underlying causes of the continuing violations by implementing remedial measures some of which, due to their large

scale, will take several years to complete. The State was unquestionably aware that violations would continue while the projects mandated by the 2002 Stipulation are being implemented. Even though the 2002 Stipulation does not release MMSD from liability for post-Stipulation violations, those post-Stipulation violations are clearly related in origin to the pre-Stipulation violations and have the same factual basis. Thus, the August 2002 violation (and other post-Stipulation violations) not specifically mentioned in the 2002 Stipulation are not separate and distinct causes of action, and the element of res judicata requiring an identity of causes of action is met here.

### 2. Privity of the parties

We agree with the district court that a person not a party to a previous action can be said to be in privity with an "official or agency invested by law with authority to represent the person's interests." Restatement (Second) of Judgments § 41(1)(d). Thus, "[e]ven when an agency enforcement action is not commenced until after the citizen suit, final judgment in the agency's court action will be a res judicata or collateral estoppel bar to the earlier citizen suit." *Comfort Lake Ass'n v. Dresel Contracting*, 138 F.3d 351, 356 (8th Cir. 1998). This, however, presumes that the agency was acting in its *parens patriae* role as a representative of the public. As a representative of the public's interests, the State is subject to the exceptions enumerated in section 42 of the Restatement (Second) of Judgments, including the following: "A person is not bound by a judgment for or against a party who purports to represent him if . . . [t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent." Restatement (Second) of Judgments § 42(1)(e). Thus, in order for the state agency to be in privity with the

public's interests, the state's subsequently-filed government action must be a diligent prosecution. And if the subsequently-filed government action is a diligent prosecution, "the fact that . . . any . . . private attorney general is barred from duplicating that effort should hardly seem surprising or harsh."[9] *Hudson River Fishermen's Ass'n v. County of Westchester*, 686 F. Supp. 1044, 1052 (S.D.N.Y. 1988), *quoted in United States EPA v. Green Forest*, 921 F.2d 1394, 1405 (8th Cir. 1990). So the question becomes whether the State's action was diligent.

We look to the language of the Act to find out what is meant by "diligent prosecution." Citizens' suits are barred "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State *to require compliance with the standard, limitation, or order.*" 33 U.S.C. § 1365(b)(1)(B) (emphasis added). Thus, if the judicial action is "capable of requiring compliance" with the Act and is "calculated to do so," the citizens' suit will be barred. Jeffrey G. Miller, "Overlooked Issues in the 'Diligent Prosecution' Citizen Suit Preclusion," 10 Wid. L. Symp. J. 63, 84, 85 (2003). Notwithstanding these considerations, diligence does not require a state agency to have perfect foresight. As we have previously held in the context of the RCRA, which has a

---

[9] We decline to adopt the plaintiffs' argument that "in a situation where a citizen suit has been filed prior to the State's commencement of an enforcement action, the privity element of res judicata can never be satisfied." (Plaintiffs' Br. at 40.) *See Atlantic States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991) ("However, we do not believe the Clean Water Act can or should be read to discourage a governmental enforcement action once a citizen suit has been commenced nor to prevent state or local authorities from achieving a settlement as to conduct that is the subject of a citizen complaint. To hold otherwise would likely lead to underenforcement of the Clean Water Act.").

materially similar diligent prosecution requirement, "[t]he statute does not require that the [State] succeed; it requires only that the [State] try, diligently." *Supporters to Oppose Pollution v. Heritage Group*, 973 F.2d 1320, 1324 (7th Cir. 1992).

The district court found that the 2002 litigation and Stipulation represented a diligent prosecution because the 2002 Stipulation was intended by the parties to present "a comprehensive solution to sanitary sewer overflows, regardless of their cause, including but not limited to wet weather events, equipment malfunctions, and operator error" (PSA at 22) and to "bring MMSD into compliance with the WPDES permit" (*id.* at 24). The 2002 Stipulation requires significant changes to MMSD's operating structure at considerable expense, including storage and conveyance capacity expansions and treatment plant and interceptor sewer upgrades. MMSD was obligated to complete its sanitary sewer evaluation study and to require satellite municipalities to reduce inflow and infiltration by 5% by the end of 2002. MMSD was additionally required to implement a CMOM plan by June 30, 2007, which is intended to help reduce (with the goal of eliminating) all non-permitted SSOs. (Plaintiffs' Sep. Appx. at 184.)

We recognize that diligence on the part of the State is presumed. *See, e.g., Connecticut Fund for the Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986) ("[T]he court must presume the diligence of the state's prosecution of a defendant absent persuasive evidence that the state has engaged in a pattern of conduct that could be considered dilatory, collusive, or otherwise in bad faith."). We surmise that this presumption is due not only to the intended role of the State as the primary enforcer of the Clean Water Act, *see Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987), but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems. *See North & S.*

*Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552, 557 (1st Cir. 1991). Yet, we think a diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator with whom it settled regarding their intent with respect to the effect of the settlement. Our diligent prosecution analysis of the 2002 Stipulation will examine whether it is capable of requiring compliance with the Act and is in good faith calculated to do so. *See* Miller, *supra*, 10 Wid. L. Symp. J. at 84, 85.

   The plaintiffs raise several concerns about the diligence of the 2002 Stipulation that can be easily dispensed with, and one which we think has merit. All are nonetheless worth discussing. First, the plaintiffs argue the 2002 Stipulation is not a diligent prosecution because it does not include a provision expressly requiring compliance with MMSD's WPDES permit and the Act. MMSD rejoins that, it is not necessary to include language requiring compliance because the Act and Wisconsin's permitting statute themselves require compliance, and the 2002 Stipulation does not relieve MMSD from its obligation to comply. The State is not prevented from bringing enforcement actions if post-Stipulation violations occur. Moreover, MMSD points out that adding compliance language would not bring about compliance absent treatment of the underlying causes of the violations. *See Clean Air Clean Air Council v. Sunoco, Inc.*, 2003 U.S. Dist. LEXIS 5346, at *15-*16 (D. Del. 2003) (rejecting a plaintiff's contention that the state's consent order should have included language requiring compliance and focusing the diligent prosecution inquiry on the actions required to eliminate the cause of the violations). We agree that the focus of the diligent prosecution inquiry should be on whether the actions are calculated to eliminate the cause(s) of the violations. Since MMSD was not relieved from complying with the Act and its permit, the addition of compliance language in the present circumstances is

unnecessary and would not bring about compliance any faster or more efficiently.

The plaintiffs also argue that the 2002 Stipulation gives MMSD until 2010 to complete construction of certain sewer improvements which are not guaranteed to result in compliance with the Act. MMSD points out that the deadlines are necessary "because of the actual amount of time it takes to plan, solicit bids, and construct public works of this magnitude." (MMSD's Br. at 25.) The deference we owe to the State's actions comes into play in determining whether these deadlines are too lengthy to be diligent: as we have said, we are not in the business of constructing sewage facilities. We conclude that the construction deadlines incorporated in the 2002 Stipulation are not so lengthy as to indicate a lack of diligence. "Merely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief." *Scituate*, 949 F.2d at 558, *quoted in Supporters to Oppose Pollution*, 973 F.2d at 1324.

The plaintiffs also allege that the 2002 Stipulation does not address the violations that are due to operational failures and mismanagement, though the only specific MMSD policy the plaintiffs have pointed out as mismanagement is the policy of reserving a certain amount of Deep Tunnel capacity to handle wet-weather SSOs, resulting in larger-than-necessary CSOs.[10] Specifically, after a July 1999 storm that resulted in a 62.2 million gallon SSO, MMSD increased the volume of capacity it reserves in the Deep Tunnel to accommodate sanitary sewage, from 40 million gallons to 200 million gallons. (PSA at 241.) Although this policy has

---

[10] This policy was first mentioned by the plaintiffs at oral argument when discussing MMSD's "mismanagement." Prior to that, the plaintiffs had never specified which operational or management problems were causing violations.

reduced the volume of SSOs, it did so by allowing CSOs instead, even at times when the Deep Tunnel was not filled to capacity. (*Id.*) The 2002 Audit Report estimated that the volume of CSOs between 1994 and July 2002 would have been reduced by 656 million gallons if unused capacity had not been kept in reserve. (PSA at 242.) But the solution to this problem requires accurate prediction of weather patterns and storm intensity. MMSD's current automated system lacks the sophistication to permit precise predictions of sewage flow, and this, combined with the well-known inaccuracies of weather forecasts, means that discharge decisions are frequently made with incomplete information. (PSA at 243.) MMSD is, however, installing a $3.3 million Real Time Control System that provides updated information on system performance every 15 minutes or less, which should help MMSD maximize existing system capacity during heavy storms. (PSA at 298.) We also note that the CSOs caused by MMSD's reservation of Deep Tunnel capacity to handle sanitary sewage were not violations of the Act or of MMSD's permit. Though we question the permitting decision that has created the incentive for MMSD to avoid violations by shifting its discharges from SSOs to larger-than-necessary CSOs during heavy storms, we cannot say that MMSD's reserve capacity policy is not in compliance with the Act or its permit.[11]

Although the reasons contributing to MMSD's recent massive and distressing discharges of sewage indicate that MMSD may not have put all of its operational and management difficulties behind it, the plaintiffs' vague allegations that the 2002 Stipulation fails to address MMSD's opera-

---

[11] Mechanical failures have also caused some SSOs, but they represent less than half of one percent of the total volume discharged from sanitary sewers from 1994-2002. *Id.* at 234. MMSD confirmed at oral argument that its dry weather SSOs were caused by equipment malfunction.

tional and management difficulties are insufficient to indicate that MMSD will thereby be prevented from complying with the Act after work mandated by the 2002 Stipulation is completed. If any additional operational or management problems have become evident since the 2002 Stipulation,[12] the State and MMSD are entitled by the Act to an opportunity to resolve them before the plaintiffs may jump into the fray.

The last of the easily-disposed-of arguments is that the 2002 Stipulation imposes no penalties for past violations, nor does it include stipulated penalties for future violations. Basically, the plaintiffs seem to want us to announce a rule that diligence requires penalties. With respect to the lack of penalties for pre-Stipulation violations, MMSD argues that under *Gwaltney* and the First Circuit's interpretation of it in *North & South Rivers Watershed Ass'n v. Town of*

---

[12] *See, e.g.*, Resler, *The Sound of Lame Excuses*, MILWAUKEE J. SENTINEL, May 20, 2004, at 22A ("Officials of the Milwaukee Metropolitan Sewerage District said this week that for an 18-hour period in the middle of last weekend's massive dumping of raw sewage, only one of the three giant pumps critical to the operation of the district's controversial deep tunnel system was actually working. As storms drenched the area, that left just one pump to transfer millions of gallons of sewage from the deep tunnel, where it is stored, to the district's two treatment plants."); *id.* ("[A] construction project—the replacement of two huge galvanized steel holding tanks on Jones Island—effectively reduced capacity at the district's two treatment plants. Critics have wondered why the tanks are being replaced now during the rainy season, a legitimate point."); Steve Schultze and Marie Rohde, *Equipment Glitches Still Plague MMSD*, MILWAUKEE J. SENTINEL, June 17, 2004, at 1A ("MMSD officials [agreed] that yet another project—replacement of giant sewage holding tanks—also probably contributed to the overflows, but only slightly. . . . Only one or two of the three giant tunnel pumps were used during the May rains and dumping because the holding tanks are under construction and several months past their projected completion date.").

*Scituate*, the government may choose to forego civil penalties in favor of securing expensive capital improvements. Given that the focus of our inquiry is on whether the State's actions are going to bring about compliance, the presence or absence (or, for that matter, the size) of penalties does little, on its own, to shed light on the diligent prosecution inquiry. It is true that compliance may be coerced by penalties if they are sufficiently high to deter the violations. *See* Miller, *supra*, 10 Wid. L. Symp. J. at 86. In order to have a deterrent effect, the penalty must be high enough that the violator would find it less expensive to take whatever actions are necessary to comply than to continue violating. This is why courts have considered whether penalties are assessed and whether the amount of the penalty has taken into account the economic benefit the violator derived from noncompliance. *See*, *e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC)*, 890 F. Supp. 470, 489-95 (D.S.C. 1995), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 167 (2000).

But penalties are by no means a *requirement* for compliance to be assured. Repeated violations due to the same underlying systemic causes are likely to continue until a large-scale remedial project addressing those underlying causes is completed (assuming the large-scale project will successfully and permanently abate the conditions causing the violation). And large-scale remedial projects, as we have earlier noted, can take years. We agree with the First Circuit that "[d]uplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway do not further [the goals of the Clean Water Act]. They are, in fact, impediments to environmental remedy efforts." *Scituate*, 949 F.2d at 556; *see also* Peter A. Appel, "The Diligent Prosecution Bar to Citizen Suits: The Search for Adequate Representation," 10 Wid. L. Symp. J. 91, 101-02 (2003) (noting that allowing citizens' suits for penalties to proceed

when expensive remedial action is required both hinders negotiated settlements and is unlikely to help the environment). Levying additional penalties on violators who are undertaking massive remedial projects will not bring about compliance any faster or cause the result to be any more effective—it will just cause the result to be more expensively arrived at.

As for the post-Stipulation violations, although it is true that there are no provisions for stipulated penalties in the 2002 Stipulation, MMSD points out that neither does it prevent the State from bringing subsequent enforcement actions for subsequent violations. The concern with diligent enforcement is *whether* violations are prosecuted, not *how* they are prosecuted. *See Clean Air Council*, 2003 U.S. Dist. LEXIS 5346, at *11-*12 (finding that stipulated penalties are just as diligent as seeking the same penalty in a separate enforcement action). If the State fails to diligently prosecute post-Stipulation violations, the plaintiffs may prod it into action, as they did here.

We do, however, share the plaintiffs' concern that the planned improvements to MMSD's system under the 2002 Stipulation may not in fact result in MMSD's eventual compliance with the Act and its permit. (*See* Plaintiffs' Br. at 30-31; Reply Br. at 6.) The 2002 Audit Report attributed MMSD's overflows to the magnitude of storms in recent years, as well as capacity issues in the Deep Tunnel and MMSD's sewers and treatment facilities. (PSA at 231.) During planning for the Deep Tunnel, the capacity requirements were estimated based on the largest storm previously recorded in the Milwaukee area, which occurred in June 1940. (PSA at 234.) However, from the time the Deep Tunnel came on line in 1994 through July 2002, there were five storms larger than the June 1940 storm of record, resulting in discharges of 394.7 million gallons from sanitary sewers and over 4 billion gallons from combined sewers. (PSA at 235.) Not only has the Deep Tunnel been unable to handle

storms larger than it was designed for, but it has also proved insufficient to capture wastewater from storms smaller than the storm of record on nine occasions, resulting in SSOs totaling approximately 528 million gallons. (PSA at 236.) The Deep Tunnel was also planned based on assumptions that infiltration and inflow from surrounding communities would be reduced by 12.5%; they have instead increased by 17.4%. (PSA at 237.) Sedimentation has further reduced available capacity in the Deep Tunnel by a small amount (2.1 million gallons). (PSA at 240.)[13]

We do not deny that increasing the storage and conveyance capacity in MMSD's system should reduce the number and volume of overflows. But MMSD itself admits that what the 2002 Stipulation accomplishes is the eventual *reduction* of overflows, not elimination of them. As MMSD pointed out to the plaintiffs, "[t]he Northwest Side Sewer Relief Project is intended to have sufficient capacity to capture most of the volume of events comparable to those experienced since the start up of the Inline Storage System. . . . [R]eduction in *number of SSO events* is contemplated; not a *percent reduction in total volume of SSO's*." (MMSD's Supp. Appx. at 98; *see also* MMSD's Br. at 46 (noting that the State accomplished "guaranteed meaningful relief in the form of capital improvements and operational changes that will *actually reduce the number of overflow events*") (emphasis added).) Compliance means an *end* to violations, not merely a reduction in the number or size of them. That is why courts have considered whether the alleged diligent prosecution achieves a permanent solution or whether violations will

---

[13] A problem related to siphons in the sewer system is causing a significant amount of wastewater to be diverted into the Deep Tunnel rather than being treated immediately by the treatment plant (PSA at 239), but MMSD began a project in 2001 to improve the efficiency and capacity of these siphons, which is expected to be completed in 2007 (PSA at 299).

continue notwithstanding the polluter's settlement with the government. *See Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 127-28 (2d Cir. 1991); *New York Coastal Fishermen's Ass'n v. New York City Dep't of Sanitation*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991).

Contrary to the district court's finding, we do not feel confident that the 2002 Stipulation will indeed result in elimination of the root causes underlying the large-scale violations alleged by the plaintiffs, regardless of the State's and MMSD's self-serving statements that it is intended to do so. We note the persistence of violations due to the same underlying causes even after the 1977 Stipulation was fully implemented (and despite a similar intention that the capacity-increasing projects would "eliminate dumping from sanitary sewers"[14]). We also note the perhaps overly cautious pace adopted by the State in evaluating the effectiveness of the remedial projects required by the 1977 Stipulation—it took eight years and a notice of intent to sue from the plaintiffs before the State took any actions that went beyond investigating and evaluating the violations that have persisted even after the Deep Tunnel came on line. While the projects mandated by the 1977 Stipulation may have been calculated in good faith to ensure MMSD's compliance, it should not have taken the State so long to arrive at the conclusion that the Deep Tunnel had been under-designed. These, along with MMSD's own admissions that the 2002 Stipulation is aimed at reducing, not eliminating, violations, are insufficient to indicate a diligent prosecution.[15]

---

[14] Schultze and Rohde, *supra* note 2, at 1B.

[15] Of course, we are aware that here, as with other regulatory circumstances, "efforts to achieve 'the last 10 percent' " would be very expensive. Stephen Breyer, BREAKING THE VICIOUS CIRCLE: TOWARD EFFECTIVE RISK REGULATION 28 (Harvard Univ. Press 1993). But we are not talking about whether the proposed re-

(continued...)

Under the circumstances of this case, we cannot say that simply throwing more money at the problems and taking an inordinately long time to determine if enough money was thrown at the problems to solve them this time around are actions calculated in good faith to bring about compliance with the Act. The record to date does not inspire confidence that effective and timely action will be taken to address problems of long standing. While the 2002 Stipulation will hopefully result in fewer and smaller violations after the mandated projects are completed, it is still, when all is said and done, a stalling tactic rather than a compliance strategy. As such, we cannot say that it is a diligent prosecution, and we cannot uphold the district court's determination that res judicata bars the plaintiffs' suit.[16]

### III.  Conclusion

Because we cannot state with certainty on the basis of this record whether the 2002 Stipulation is calculated to result in compliance with the Act, we therefore remand for a determination of that issue. Specifically, the district court

---

[15] (...continued)
medial efforts will eliminate the last gallon of sanitary sewerage discharges in a 500-year storm; rather, we are concerned that the remedial projects may, after their completion, nonetheless turn out to be too little, too late.

[16] We therefore need not determine whether fairness would render res judicata inapplicable here. *See Froebel v. Meyer*, 217 F.3d 928, 935 (7th Cir. 2000) ("Wisconsin law does not treat res judicata as an ironclad rule which must be implacably applied whenever its literal requirements are met, regardless of any countervailing considerations.") (internal quotations omitted); *McCourt v. Algiers*, 4 Wis. 2d 607, 91 N.W.2d 194, 196 (Wis. 1958) (indicating that res judicata may not apply where relitigation is necessary to prevent unfairness).

should determine whether the systemic inadequacies of MMSD's sewerage facilities will be sufficiently ameliorated by the proposed remedial projects to result in compliance. If the district court concludes, after giving some deference to the judgment of the State, that there is a realistic prospect that violations due to the same underlying causes purportedly addressed by the 2002 Stipulation will continue after the planned improvements are completed, the plaintiffs' suit may proceed. If, after a more detailed examination of the 2002 Stipulation, the district court concludes that no such prospect exists, it may so find, provide a thorough explanation of its conclusion and consider reinvocation of the res judicata bar. However, before reimposing a res judicata bar, the district court should determine whether Wisconsin's fairness exception to the res judicata doctrine should be applied here.[17]

Although we have allowed the plaintiffs' suit to continue (at least for the time being), we hope that the State, together with the parties in this matter, will take advantage of this opportunity to review the efficacy of the 2002 Stipulation in light of recent events and will be able to resolve their differences as well as the problems affecting MMSD's system. For the reasons stated above, the district court is REVERSED, and the suit is REMANDED for further proceedings in keeping with this opinion.

---

[17] As Wisconsin's Supreme Court has noted, "[c]laim preclusion may be disregarded in appropriate circumstances when the policies favoring preclusion of a second action are trumped by other significant policies. Claim preclusion . . . is a principle of public policy applied to render justice, not to deny it. Any exception to claim preclusion, however, must be limited to special circumstances or the exceptions will weaken the values of repose and reliance." *Sopha*, 230 Wis. 2d at 236.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*