**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-1517**

NATURALAND TRUST; SOUTH CAROLINA TROUT UNLIMITED; UPSTATE FOREVER,

Plaintiffs - Appellants,

v.

DAKOTA FINANCE LLC, d/b/a Arabella Farm; KEN SMITH; SHARON SMITH; WILLARD R. LAMNECK, JR.,

Defendants - Appellees.

------------------------------

SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; CHARLESTON WATERKEEPER,

Amici Supporting Appellants.

SOUTH CAROLINA CHAMBER OF COMMERCE,

Amicus Supporting Appellee.

Appeal from the United States District Court for the District of South Carolina, at Greenville. Joseph Dawson, III, District Judge. (6:20-cv-01299-JD)

Argued:  May 5, 2022                         Decided:  July 20, 2022

Before MOTZ, QUATTLEBAUM, and HEYTENS, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Heytens wrote the opinion, in which Judge Motz joined. Judge Quattlebaum wrote a dissenting opinion.

---

**ARGUED:** Michael George Martinez, SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT, Greenville, South Carolina, for Appellants. Elizabeth Bartlett Partlow, LAW OFFICES OF ELIZABETH B. PARTLOW, LLC, West Columbia, South Carolina, for Appellees. **ON BRIEF:** Amy Armstrong, Lauren M. Milton, SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT, Georgetown, South Carolina, for Appellants. Adam B. Lambert, ACKER LAMBERT HINTON, P.A., Pickens, South Carolina, for Appellees. Geoffrey R. Gisler, Alex J. Hardee, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Amici South Carolina Coastal Conservation League and Charleston Waterkeeper. Karen Aldridge Crawford, KLAC LAW LLC, Columbia, South Carolina; Michael S. Traynham, NEXSEN PRUET, LLC, Columbia, South Carolina, for Amicus South Carolina Chamber of Commerce.

---

TOBY HEYTENS, Circuit Judge:

The Clean Water Act contains a citizen-suit provision allowing adversely affected persons to sue polluters in federal court. 33 U.S.C. § 1365(a)(1). The Act also contains a provision stating that a violation of its requirements "shall not be the subject of a civil penalty action under . . . section 1365" if a State "has commenced and is diligently prosecuting an action under a State law comparable to" the federal scheme for assessing civil penalties. § 1319(g)(6)(A)(ii). The main question here is whether a state agency's notice of an alleged violation for failure to obtain a required permit, without more, "commence[s] . . . an action" within the meaning of that provision. Because we conclude it does not, we reverse the district court's judgment and remand for further proceedings.

I.

Intending to operate "a working farm with an orchard and vineyard, and later an event barn for weddings and other celebrations," Ken and Sharon Smith formed Arabella Farm, LLC. Farm Br. 2. The farm was built on property purchased by another Smith vehicle called Dakota Finance, LLC, and abutted land owned by the Smiths' son-in-law, Willard Lamneck, Jr. Like the parties, we refer to the Smiths, Lamneck, and the two LLCs collectively as Arabella Farm.

Arabella Farm's site borders South Carolina's Jocassee Gorges area and is bounded by three bodies of water—Clearwater Branch, Peach Orchard Branch, and an unnamed tributary of the Eastatoe River. In 2017, Arabella Farm began clearing 20 acres of land to create its venue. The clearing process dramatically altered the steep, mountainous landscape and exposed the underlying granular soil. Although such an extensive land

3

disturbance ordinarily would require obtaining stormwater permits and adhering to other regulations, see 40 C.F.R. § 122.26(a)(1)(ii), (9)(i)(B), (c)(1), Arabella Farm claimed its work fell within an agricultural exemption to the Clean Water Act's requirements. Before starting work, Arabella Farm did not seek any permits or install sediment or stormwater control measures, which allegedly resulted in significant discharges of sediment-laden stormwater onto nearby property and caused widespread erosion and other detrimental impacts.

Arabella Farm's activities eventually caught the attention of government regulators. In April 2019, the South Carolina Department of Health and Environmental Control (Department) conducted an inspection to evaluate the farm's compliance with the National Pollutant Discharge Elimination System (NPDES) program. The Clean Water Act regulates "point sources" that discharge pollutants and authorizes States to issue NPDES permits for such discharges. 33 U.S.C. § 1342. The permit program is administered through a scheme of cooperative federalism—the Environmental Protection Agency allows South Carolina to administer its own permit program in lieu of the federal one, see § 1342(b); 40 Fed. Reg. 28,130 (July 3, 1975), and the Department enforces the State's requirements, see S.C. Code §§ 48-1-10 *et seq.*

Subsequent site inspections revealed inadequate stormwater controls, significant erosion, and off-site impacts. In August 2019, the Department sent a letter advising Arabella Farm that it was required to obtain an NPDES permit and instructing the farm "to cease and desist any activity at the [s]ite other than the installation and maintenance of storm water, sediment and erosion control measures as directed by its design engineer." JA

4

57–58. In September 2019, the Department sent the farm a "Notice of Alleged Violation/Notice of Enforcement Conference" and informed the farm of a voluntary "informal" enforcement conference scheduled for the end of that month. JA 54, 58–59. The conference would be "closed to the public and media." JA 59.

In November of the same year, Naturaland Trust and Trout Unlimited—non-profit organizations dedicated to conserving land, water, and natural resources—sent a notice of intent to sue letter to the Smiths, Lamneck, and the registered agent of Dakota Finance. As the statute requires, the letter detailed the alleged violations of the Clean Water Act. See 33 U.S.C. § 1365(b)(1)(A).

EPA regulations also require such notices to include "sufficient information to permit the recipient to identify . . . the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a). The letter described Trout Unlimited as a "national non-profit" with "two local chapters in the Upstate of South Carolina" and "many members who regularly utilize the Eastatoe River and Little Eastatoe Creek in the vicinity of the [Smiths'] properties," and listed its name and address as: "Trout Unlimited, C/O Greg Placone, P.O. Box 27172, Greenville, S.C[.] 29616." JA 63–64, 76. At the bottom, the letter suggested contacting counsel—Michael Corley of the South Carolina Environmental Law Project—and provided Corley's address and phone number.

After the required 60-day notice period elapsed, see 33 U.S.C. § 1365(b)(1)(A), Naturaland Trust and South Carolina Trout Unlimited (together, the conservationists) sued

Arabella Farm in federal court. JA 21–48.[1] The complaint was signed by Michael Corley of the South Carolina Environmental Law Project with the same contact information provided in the notice of intent to sue letter. It identified South Carolina Trout Unlimited as "our state's affiliate of Trout Unlimited, a national non-profit group," and explained that South Carolina Trout Unlimited "has dozens of members who utilize the waters downstream of Defendants' properties"—including the "Eastatoe River and Little Eastatoe Creek"—"for trout fishing and other recreational opportunities." JA 24–25. The complaint alleged that Arabella Farm's unpermitted land-clearing project violated the Clean Water Act and resulted in various state law torts. As relief, the conservationists sought an injunction and civil penalties to be paid to the United States Treasury under federal law and injunctive relief and damages under state law.

A month after the conservationists filed their complaint, Arabella Farm and the Department entered into a consent order. The order imposed a $6,000 penalty and required the farm to obtain an NPDES permit, submit a stormwater plan and site stabilization plan, and conduct a stream assessment and any recommended remediation.

The district court dismissed the conservationists' complaint. As relevant here, the court concluded that: (1) it lacked subject matter jurisdiction over the conservationists' Clean Water Act claims because the Department had commenced and was diligently prosecuting an action for the same violations; (2) even if the Clean Water Act claims were

---

[1] Another entity, Upstate Forever, also was listed on the complaint but has not appealed its dismissal from this suit.

otherwise valid, South Carolina Trout Unlimited was not a proper party because it failed to correctly identify itself in line with the Act's notice requirements; and (3) having dismissed the federal claims, it would not exercise supplemental jurisdiction over the state law claims.

## II.

The district court erred in concluding that the diligent prosecution bar precluded the conservationists' federal claims.

## A.

A few introductory words about terminology. The Clean Water Act provides that "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation." 33 U.S.C. § 1365(a)(1)(A). The Act further states that "[t]he district courts shall have jurisdiction . . . to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties." § 1365(a). As noted earlier, however, the Act contains a carve-out—which we will call the diligent prosecution bar—providing that a "violation . . . shall not be the subject of a civil penalty action under . . . section 1365" if "a State has commenced and is diligently prosecuting an action" with respect to that same violation "under a State law comparable" to the federal scheme for assessing civil penalties. § 1319(g)(6)(A)(ii). The Act also includes an analogous provision—which we will call the judicial proceeding bar—that precludes a private action if a State or the EPA is diligently prosecuting a civil or criminal case in court (as opposed to in an administrative proceeding). § 1365(b)(1)(B).

7

This Court has previously stated that the judicial proceeding bar contained in Section 1365(b)(1)(B) is "an exception to the jurisdiction granted in subsection (a) of § 1365" and affirmed dismissals under Rule 12(b)(1) for lack of subject matter jurisdiction in situations where that bar applied. *Piney Run Pres. Ass'n v. Commissioners of Carroll County*, 523 F.3d 453, 456 (4th Cir. 2008) (quoting *Chesapeake Bay Found. v. American Recovery Co.*, 769 F.2d 207, 208 (4th Cir. 1985) (per curiam)). Quoting that same language, the district court concluded it lacked subject matter jurisdiction over the federal claims in this case because of the diligent prosecution bar in Section 1319(g)(6)(A)(ii).

Given our existing precedent, the district court's statement that—when it applies—the diligent prosecution implicates a federal court's jurisdiction was entirely understandable. In our view, however, such an approach is untenable given the Supreme Court's current approach to such matters.

As the Supreme Court has repeatedly emphasized in recent years, "jurisdiction" "is a word of many, too many, meanings." *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848 (2019) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004), in turn quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998)). Although courts—including this one—have "sometimes been profligate in [their] use of the term," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006), the Supreme Court has "tried in recent cases to bring some discipline to the use of" the label "jurisdictional," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Under the Supreme Court's current approach, the threshold question is whether "there is any 'clear' indication that Congress wanted [a particular] rule to be 'jurisdictional.'" *Id.* at 436. If not, the rule is almost never properly labeled jurisdictional "unless it governs a

8

court's adjudicatory capacity." *Id.* at 435. This is so even when the rule in question is "mandatory" or constitutes a "precondition[ ] to relief." *Fort Bend County*, 139 S. Ct. at 1849; see *id.* at 1849–50 (collecting cases holding such rules are non-jurisdictional).

Under those standards, the diligent prosecution bar does not implicate a court's jurisdiction. The diligent prosecution bar "is not clearly labeled jurisdictional" and "is not located in a jurisdiction-granting provision." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010). Instead, it merely prohibits certain violations from being "the subject of a civil penalty action." 33 U.S.C. § 1319(g)(6)(A)(ii). Nor is there any indication that the diligent prosecution bar is meant to "govern[ ] [the] court's adjudicatory capacity." *Henderson*, 562 U.S. at 435. To the contrary, the relevant provision references the citizen-plaintiff bringing suit, not the court. Cf. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 175 (2000) (noting that the Clean Water Act "bars *a citizen* from suing if the EPA or the State has already commenced, and is diligently prosecuting, an enforcement action" (quotation marks omitted, emphasis added)).[2]

The notion that the judicial proceeding bar implicates subject matter jurisdiction appears to have originated from our 1985 decision in *Chesapeake Bay Foundation*. Having reviewed that decision, however, we conclude it was "the kind of drive-by jurisdictional

---

[2] Section 1365(a) does use the word "jurisdiction" at one point. See 33 U.S.C. § 1365(a) ("The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties . . . ."). But the diligent prosecution bar is neither contained in nor references that portion of the statute. Instead, the diligent prosecution bar is framed as an exception to the entirely separate authorization to "commence a civil action" in the subsection's first provision.

ruling of the sort that was more common before Supreme Court decisions like *Steel Company* made clear" the need for greater precision in the use of that term. *B.R. v. F.C.S.B.*, 17 F.4th 485, 496 (4th Cir. 2021) (quotation marks and alterations omitted). And because our later decision in *Piney Run* had no occasion to independently consider whether the judicial proceeding bar was properly understood as truly jurisdictional—in particular, because that case involved no issues of waiver or forfeiture, cf. *Miranda v. Garland*, 34 F.4th 338, 350 (4th Cir. 2022)—it appears that *Piney Run* echoed *Chesapeake Bay Foundation*'s drive-by jurisdictional ruling without independent consideration. See *Piney Run*, 523 F.3d at 456.

At any rate, this case involves the diligent prosecution bar contained in Section 1319(g)(6)(A)(ii) rather than the judicial proceeding bar at issue in *Chesapeake Bay Foundation* and *Piney Run*. So, although there may well be reason for skepticism about whether the judicial proceeding bar is properly labeled jurisdictional under the Supreme Court's current approach,[3] we need not resolve that issue here. Instead, we clarify that the diligent prosecution bar does not implicate an Article III court's subject matter jurisdiction.

---

[3] Like the diligent prosecution bar, the judicial proceeding bar "is not clearly labeled jurisdictional" and "is not located in a jurisdiction-granting provision." *Reed Elsevier*, 559 U.S. at 166. Instead, it provides that "[n]o action may be commenced" if a State or the EPA has already sued in federal or state court. 33 U.S.C. § 1365(b)(1)(B). Indeed, the judicial proceeding bar appears in the same subsection as a mandatory 60-day notice provision, see 33 U.S.C. § 1365(b)—precisely the kind of "time prescriptions for procedural steps in judicial . . . forums" that have been repeatedly deemed non-jurisdictional, *Fort Bend County*, 139 S. Ct. at 1850 (collecting cases).

B.

We turn next to why the diligent prosecution bar does not preclude this suit.

We start, as always, with the text. The diligent prosecution bar is triggered by the State's "commence[ment]" of "an action under a State law" that is "comparable to" the federal statute addressing "administrative penalties" that the government may assess for violations of the Clean Water Act. 33 U.S.C. § 1319(g)(6)(A)(ii). In contrast, the diligent prosecution bar "shall not apply" to citizen suits "filed prior to commencement of" such an action. § 1319(g)(6)(B)(i).

Whatever else the Department's notice of alleged violation may have started, it seems odd to describe it as commencing "an action." 33 U.S.C. § 1319(g)(6)(A)(ii). In the legal context, the term "action" typically refers to "an entire case or suit," an understanding that is "grounded in the Federal Rules of Civil Procedure." *Tolbert v. Stevenson*, 635 F.3d 646, 650 (4th Cir. 2011). True, the provision before us references "an action under a State law" that is "comparable to" a federal administrative enforcement proceeding rather than one filed in court. 33 U.S.C. § 1319(g)(6)(A)(ii). But the essential character of an "action"—an adversarial proceeding initiated by a formal, public document—remains. Cf. 1 *Oxford English Dictionary* 128 (J.A. Simpson & E.S.C. Weiner, eds., 1989) (defining "action" as "[t]he taking of legal steps to establish a claim or obtain judicial remedy").

Examining the features of a Section 1319(g) proceeding—which a state action must be "comparable" to for the diligent prosecution bar to apply—further supports our view of when an "action" has been "commenced." 33 U.S.C. § 1319(g)(6)(A)(ii). In particular, Section 1319(g)(4) provides for certain "rights of interested persons," including rights to

11

public notice and judicial review. In addition, the rules of practice governing Section 1319(g) proceedings state that a proceeding "is commenced" by filing a complaint or the simultaneous issuance of a consent agreement and final order. 40 C.F.R. §§ 22.13, 22.38. The same regulations further specify that, "before assessing a civil penalty," a complainant "shall notify the public" either "within 30 days following proof of service of the complaint on the respondent," or "no less than 40 days before the issuance of" a consent agreement and final order assessing a civil penalty. § 22.45.

When asked about these regulations at oral argument, Arabella Farm correctly pointed out that they govern the EPA's own proceedings rather than those conducted under state law. Oral Arg. 18:50–21:00. But these regulations help to inform our understanding of when a "State has commenced" an action that is "comparable" to the one set forth in 33 U.S.C. § 1319(g). And both Section 1319(g) and its accompanying regulations suggest the diligent prosecution bar would not be triggered until a state agency has begun a comparable formal process that entails public notice.

This understanding of what it means to commence the relevant sort of action is only bolstered by the comparability analysis that the district court employed to assess whether the diligent prosecution bar applied. The rough comparability analysis employed by most of our sister circuits looks to whether the state law provides similar opportunities for public participation and availability of judicial review. See, *e.g.*, *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1251–56 (11th Cir. 2003). And although Arabella Farm and the district court pointed to the availability of public participation and judicial review of the Department's consent orders under South Carolina law as support for application of the

12

diligent prosecution bar here, see S.C. Code § 48-1-200; JA 84, neither of these features is available until *after* the issuance of a departmental consent order. In other words, the comparable features were not yet available at the time this suit was filed because no comparable action had yet commenced.

Our sister circuits have looked to similar features in determining whether the Clean Water Act's diligent prosecution bar precludes a particular suit. The Seventh Circuit has held that, "for the purposes of § 1319(g), an administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties." *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 756 (7th Cir. 2004). The Eighth Circuit similarly concluded that an action had "commenced" at the time the State filed a consent administrative order, explaining that once the order was issued, "interested third parties had a right to intervene, and certain notice and hearing procedures became available to interested third parties." *Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir. 1994).[4]

In response, Arabella Farm insists the practices of the EPA and the States—the "primary enforcer[s]" of the Clean Water Act, *Piney Run*, 523 F.3d at 459—take a more flexible view of what constitutes "commencement." For instance, Arabella Farm contends that the Department considers a notice of violation to be "the first step in the administrative

---

[4] The court recognized that States should be "afforded some latitude in selecting the specific mechanisms of their enforcement program" but never suggested that a process without any of these features would be comparable under § 1319(g). *Arkansas Wildlife*, 29 F.3d at 380.

13

enforcement process," JA 59, and quotes an EPA publication that generally describes a notice of violation as a "form of" administrative enforcement action, Farm Br. 23 (quotation marks omitted). But the handful of public statements Arabella Farm cites—none of which were made in the context of defining commencement under the diligent prosecution bar—cannot overcome the text of the Act, which makes clear that 33 U.S.C. § 1319(g) is the relevant comparator.

On the facts of this case, we do not think the Department's notice of alleged violation was enough to commence an action that was comparable to one brought under federal law. That notice invited Arabella Farm to an informal, voluntary, private conference with the Department to discuss allegedly unauthorized discharges. The notice mentioned no penalties or sanctions that would flow specifically from the failure to attend the conference. Of course, it was possible that the Department would determine Arabella Farm had violated the relevant provisions and issue a unilateral administrative order or (as it ultimately did) enter a consent order with Arabella Farm that included a civil penalty. But the only question here is whether the notice *itself* "commenced . . . an action" of the relevant sort. 33 U.S.C. § 1319(g)(6)(A)(ii). Although the notice may have been an important and even necessary step in the Department's process—like a demand letter before civil litigation—it did not commence an action within the common understanding of those terms. And because the Department had not yet commenced an action when the conservationists filed their citizen suit, the diligent prosecution bar does not preclude them from pursuing a civil penalty action. See 33 U.S.C. § 1319(g)(6)(B)(i) (providing that the

14

diligent prosecution bar does not apply if a citizen suit was "filed prior to commencement of an action" by the EPA or a State).[5]

### III.

We also hold that the district court erred in concluding that South Carolina Trout Unlimited was not permitted to sue under the Clean Water Act.

The Act declares that no citizen suit "may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation . . . to any alleged violator." 33 U.S.C. § 1365(b)(1)(A). EPA regulations, in turn, state that the relevant notice "shall include sufficient information to permit the recipient to identify . . . the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a). The district court concluded that South Carolina Trout Unlimited failed to satisfy those requirements because the notice of intent to sue letter referenced only "Trout Unlimited" and contained "no mention of" *South Carolina* Trout Unlimited. JA 19–20.

We disagree. Although the letter did not contain the specific words "South Carolina Trout Unlimited" in that order, it described Trout Unlimited as a "national non-profit" with "two local chapters in the Upstate of South Carolina" and explained the same basis for

---

[5] Although Pickens County also conducted a separate investigation into whether Arabella Farm should have obtained a county-issued stormwater permit before starting its land-clearing project, Arabella Farm has disclaimed reliance on those enforcement efforts. Indeed, the diligent prosecution bar precludes citizen suits only when a "*State* has commenced and is diligently prosecuting" an action, 33 U.S.C. § 1319(g)(6)(A)(ii) (emphasis added), and counties generally are not treated as States for purposes of federal law, see, *e.g.*, *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890). Nor is there any claim that the State delegated its own enforcement authority to Pickens County.

15

associational standing ultimately described in the complaint (its members who use the Eastatoe River and Little Eastatoe Creek to fish trout). Compare JA 63–64, 76, with JA 24–25. Those details gave Arabella Farm "sufficient information" to identify the full name, address, and telephone number of South Carolina Trout Unlimited, 40 C.F.R. § 135.3(a)—the entity that eventually filed this suit. Accord *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 400 (4th Cir. 2011) (cautioning against "overly technical application of regulatory notice requirements").

We emphasize that plaintiffs can easily avoid imprecision with names, addresses, and telephone numbers and that more serious discrepancies that make it cumbersome for a defendant to identify the potential plaintiff may lead to dismissal under the applicable law and regulations. Here, however, there is no argument that Arabella Farm suffered any harm or had any difficulty ascertaining the identity or contact information of the party that would sue. Accordingly, we reverse the district court's ruling on this point and direct that, on remand, South Carolina Trout Unlimited be reinstated as a party.

*    *    *

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*

16

QUATTLEBAUM, Circuit Judge, dissenting:

This appeal involves the scope of citizen suits under the Clean Water Act. States hold "the primary responsibilities and rights" in managing our nation's water resources. *See* 33 U.S.C. § 1251(b). In contrast, citizen suits are intended to "supplement rather than to supplant governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987). They are permissible if, but only if, "the government cannot or will not command compliance." *See id.* at 62.

By permitting the citizen suit here to proceed despite the measures South Carolina had already taken, the majority's decision elevates citizen suits above their supplemental role. In my view, the South Carolina Department of Health and Environmental Control ("DHEC") had commenced and was diligently prosecuting an administrative penalty action under state law comparable to 33 U.S.C. § 1319(g). Thus, I would affirm the district court's decision that § 1319(g)(6)(A) bars the claim for monetary penalties in the citizen suit here.

My disagreement with the majority leaves open Plaintiffs' contention that their claims for injunctive relief should have been preserved. On this issue, the district court erred in concluding that the § 1319(g) citizen suit bar automatically includes a bar on injunctions. So, I would vacate the district court's dismissal of Plaintiffs' injunction claims. And while I am skeptical that the elements of an injunction could be met when DHEC has commenced and is diligently prosecuting an administrative penalty action under a regulatory regime comparable to § 1319(g), I would let the district court consider the merits of such claims on remand.

17

I.

The Clean Water Act permits citizen suits against any person who violated the Act's water quality standards. *See* 33 U.S.C. § 1365(a). But the principal means of effectuating water quality standards is through government enforcement. *See Gwaltney*, 484 U.S. at 60 ("The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action."); *see also Ohio Valley Env't Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 145 (4th Cir. 2017) ("Congress enacted the citizen suit provision of the Clean Water Act to address situations . . . in which the traditional enforcement agency declines to act.").

The government agency responsible for enforcement can be the U.S. Environmental Protection Agency or the U.S. Army Corps of Engineers. *See, e.g.*, 33 U.S.C. §§ 1319, 1344(s). But the Clean Water Act's cooperative federalism framework makes clear that states and their enforcement bodies are primarily in charge of enforcement. *See id.* § 1251(b) (declaring Congress's policy that states hold "the primary responsibilities and rights" to manage the nation's water resources and to consult with the EPA accordingly); *see also New York v. United States*, 505 U.S. 144, 167 (1992); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).

And citizen suits may be barred when the state is in fact enforcing the Clean Water Act. This can happen in two ways. First, if a state brought a lawsuit in court similar to the citizen suit, the citizen suit may be barred. *See* 33 U.S.C. § 1365(b) ("No action may be commenced-- . . . (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State . . . .").

18

Second, if a state has commenced and is diligently pursuing an *administrative* penalty action instead of any formal lawsuit, the citizen suit may also be barred. The Act states: "any violation-- (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under . . . [the citizen suit provisions]." *Id.* § 1319(g)(6)(A); *see also McAbee v. City of Fort Payne*, 318 F.3d 1248, 1249 (11th Cir. 2003) (discussing how the 1987 amendments to the Clean Water Act "extended the bar on citizen suits, instructing that an administrative penalty action is enough to preclude a citizen suit").

These provisions make good sense. If citizen suits are permitted when the government cannot or does not act, they should not be allowed when the government is enforcing the Clean Water Act through a lawsuit or administrative proceedings.

II.

The question before us is whether, at the time of Plaintiffs' citizen suit, DHEC "[had] commenced and [was] diligently prosecuting an action under a State law comparable" to the federal statute addressing administrative penalties.[1] 33 U.S.C. § 1319(g)(6)(A)(ii). For me, the answer is yes. Therefore, I would affirm the district court's dismissal of the citizen suit to the extent that Plaintiffs seek monetary penalties.

---

[1] Before that, the majority also concludes that the diligent prosecution bar does not implicate subject matter jurisdiction, and that our decisions to the contrary are "untenable" given recent Supreme Court decisions on the matter. While I do not disagree that some tension exists, this issue was not raised below, was not briefed in front of us and is not a sufficient condition to resolve the case. Thus, I would decline to address it.

19

A.

Let's start with whether South Carolina had "commenced" an action at the time of Plaintiffs' suit. I will first explain why DHEC's Notice of violation did, in fact, commence an action and then discuss my disagreement with the majority's conclusion to the contrary.

1.

Congress did not define "commence" in the Clean Water Act. And prior to today, we have not had an occasion to interpret the term. With no statutory or precedential definition to rely on, I consider the ordinary meaning of the word. *See, e.g.*, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law* 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation.").

One way to identify the ordinary meaning of a word is through dictionaries. Webster's Dictionary offers two definitions I consider applicable. One is simple—to begin or to start. *Commence*, *Webster's Third New International Dictionary* (1986).[2] The other applies more to a legal proceeding like the one we encounter here—to initiate formally by performing the first act of a legal proceeding. *Id*.

But whichever definition we apply, what DHEC did meets the definition of commencing an action. Prior to the citizen suit, DHEC issued Arabella Farm a Notice of

---

[2] Congress added the provision at issue, 33 U.S.C. § 1319(g), on February 4, 1987. Water Quality Act of 1987, Pub. L. No. 100-4, § 314(a), 101 Stat. 7, 46–49. Of course, our modern understanding of "commencement" remains essentially the same.

20

Violation. This is the first step the agency takes in enforcing its environmental laws. *See* DHEC, *Uniform Enforcement Policy for the Office of Environmental Quality Control* ("*Uniform Enforcement Policy*"), at § II.1 (1999) ("When, based upon available information, it is determined that there is a violation of any applicable statute, regulation, standard, or permit, and the violation can be adequately documented, a Notice of Violation will be forwarded . . . .").[3]

Importantly, South Carolina has authorized DHEC to establish its enforcement procedure, *see, e.g.*, S.C. Code Ann. § 48-1-50, and, under that authority, DHEC determined to begin those procedures with a Notice of Violation. Reflecting this, DHEC enclosed "An Overview of the Administrative Enforcement Process" with its Notice to Arabella Farm which states that DHEC's Notice "is the *first step* in the administrative enforcement process." J.A. 54, 59 (emphasis added). From South Carolina's perspective, the Notice of Violation "began" and/or "formally initiated" enforcement proceedings.

This Notice of Violation is more than just an "informal" inquiry that the majority considers the document to be. The Notice memorialized that DHEC had investigated the matter, which included multiple field visits, and that the agency corresponded with Arabella Farm for almost six months. It accused Arabella Farm of violating specific provisions of South Carolina's environmental laws. And the Notice of Violation demanded

---

[3] To be precise, DHEC issued a notice of alleged violation and enforcement conference. DHEC issues such consolidated notice if the agency "determines that a response to the Notice of Violation is nonessential and that a conference to discuss the violation(s) is desirable." *See* DHEC, *Uniform Enforcement Policy*, *supra*, at § II.2. Of course, this distinction makes no difference in our commencement analysis here.

21

Arabella Farm's presence to explain its position on such accusations in front of DHEC. Had Arabella Farm failed to attend the conference, it would have risked an administrative ruling requiring it to pay monetary penalties.[4]

Importantly, the Clean Water Act's cooperative federalism framework encourages states to experiment with different regulatory approaches. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 647 (4th Cir. 2018). Under that framework, the state's view of what commences its proceeding should be respected. The Eighth Circuit recognized this principle in *Arkansas Wildlife Federation v. ICI Americas, Inc.*, 29 F.3d 376 (8th Cir. 1994). It held that "the states are afforded some latitude in selecting the specific mechanisms of their enforcement program." *Id.* at 380. And because the state agency followed the procedures as the agency itself outlined in accordance with its state law, the Eighth Circuit concluded that the agency "commenced" an action within the meaning of 33 U.S.C. § 1319(g)(6)(A)(ii). *See id.* We should follow that deferential approach here. To me, this resolves whether DHEC commenced an action.

---

[4] The Notice of Violation also discussed Pickens County's involvement in the matter. Prior to DHEC's actions, Pickens County issued notices of violation which alleged that Arabella Farm "fail[ed] to obtain the required land disturbance, storm water and/or sediment and erosion control permits." *See* J.A. 55–56. Eventually Pickens County and Arabella Farm entered into a consent agreement, which required certain stabilization measures but no permit. I need not decide whether the county's enforcement actions should be considered a part of DHEC's enforcement authority. *But see, e.g.*, S.C. Code Ann. § 48-14-60 (allowing DHEC to delegate stormwater regulations to local governments, in which such delegation may constitute an activity by the state for purposes of 33 U.S.C. § 1319(g)(6)(A)(ii)). But at minimum, the Notice of Violation makes clear that DHEC was aware of Pickens County's enforcement activities and found such facts important enough to be included in the document.

2.

The majority reaches a different conclusion on commencement. It finds that DHEC had not yet commenced an "action" that is "comparable" to the federal statute addressing administrative penalties. For the reasons below, I disagree.

a.

The majority does not address the common understanding of the word "commence." Instead, it begins its analysis by questioning whether the Notice of Violation commenced an "action" for purposes of § 1319(g)(6)(A). Although the majority initially insinuates that the definition of an "action" must parallel what occurs in the lawsuit context—an "entire case or suit"—it recognizes that the appropriate reference point should be "a federal administrative enforcement proceeding rather than one filed in court." *See* Maj. Op. 11. Rightfully so. Everyone agrees that Congress contemplated administrative penalty actions to be different from lawsuits. *See, e.g., id.* at 7 (discussing the distinction between the "diligent prosecution bar" and the "judicial proceeding bar"). Thus, "action" must mean something different from the definition used in a lawsuit context.

The majority then proclaims that "the essential character of an 'action'" is "an adversarial proceeding initiated by a formal, public document." *Id.* at 11. Even assuming this to be the proper test, the majority never applies it to the Notice of Violation or DHEC's enforcement proceedings. Doing so reveals that the Notice meets the standard the majority adopts.

As I just described, DHEC's enforcement proceedings were certainly adversarial. In the Notice of Violation, DHEC accused Arabella Farm of violating South Carolina's

23

environmental laws and required Arabella Farm to respond to such accusations. Non-attendance would have risked an assessment of monetary penalties and other sanctions.

And the Notice of Violation was sufficiently formal. The Notice outlined DHEC's investigative efforts and the laws DHEC accused Arabella Farm of violating. In reality, aside from the difference in labeling, the Notice of Violation was comparable to a complaint in the lawsuit context. Under the Federal Rules of Civil Procedure, a complaint must include "(1) . . . grounds for the court's jurisdiction . . . ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought." Fed. R. Civ. P. 8(a). The Notice of Violation included all those elements since it discussed DHEC's authority to administratively adjudicate the dispute, the factual findings and the alleged violation which could result in an administrative order and monetary penalties.

Finally, the Notice of Violation, being an official document from DHEC, was publicly available; a concerned citizen could obtain the document through a public records request. By its very nature, it is a public document. S.C. Code Ann. § 48-1-270 ("Any records, reports or information obtained under any provision of [the South Carolina Pollution Control Act] shall be available to the public."); *see also id.* § 30-4-10, *et seq.* (South Carolina's Freedom of Information Act).

True, the Notice of Violation might not be as easily visible as many pleadings filed in federal court. The citizen must also request the agency documents. But those issues concern degrees of accessibility, not whether a document is "public." After all, many state court complaints and briefs are equally cumbersome to detect and procure. Oftentimes such

24

documents are not readily available online and people must make formal document requests from the courthouse.

In fact, the complaint makes clear that Plaintiffs were aware of the various communications made by DHEC. *See* J.A. 34–35 (alleging "dozens of communications with Pickens County, DHEC, the Corps, and the Department of Transportation"). At minimum, the DHEC Board as a public body must give public notice of their regular and special meetings, specifying the dates, times, places and agenda of such meetings. *See* S.C. Code Ann. § 30-4-80(A), (E). As a result, the public notice of the Board meeting and the meeting's agenda would sufficiently alert interested persons such as Plaintiffs about DHEC's enforcement matters, prompting them to unearth relevant agency documents such as the Notice of Violation.

In sum, even under the majority's own standard, the Notice of Violation commenced an "action."

b.

Next, the majority explains that federal enforcement proceedings under § 1319(g) are initiated by either an administrative complaint or a consent agreement after which— based on federal regulations—public notice is required within certain time periods. The majority appears to reason that, since South Carolina does not offer public notice until a consent order is issued, a proceeding commenced by a Notice of Violation is not comparable to the federal proceedings. *See* Maj. Op. 12–13. ("In other words, the comparable features were not yet available at the time this suit was filed because no comparable action had yet commenced.").

25

Analytically speaking, the majority's approach here seems questionable. The comparability requirement of § 1319(g)(6)(A) is not part of the commencement inquiry. The statute provides that "any violation . . . (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection [§ 1319(g)] . . . shall not be the subject of a civil penalty action . . . ." 33 U.S.C. § 1319(g)(6)(A). "Comparable" does not describe or modify "commenced." Thus, while a comparison of the state and federal systems' public notice features is appropriate in examining whether the state law is comparable to § 1319(g)—indeed, I do so in Section II.C of my dissent[5]—such comparison has no bearing on whether the Notice of Violation commenced the proceedings.

In addition, the out-of-circuit cases relied on by the majority for this point do not provide the support it suggests. The majority first relies on the Eighth Circuit's decision in *Arkansas Wildlife*, 29 F.3d 376. As discussed earlier, this decision undermines the majority's position because the decision emphasizes that courts should respect the enforcement procedures created by the state. *See id.* at 380. In *Arkansas Wildlife*, the plaintiff argued that the state's issuance of a consent order had not commenced an action because it did not contain sufficient public notice and participation rights. The plaintiff argued that a notice of violation was required. The Eighth Circuit rejected this argument. Despite the fact that the Arkansas regulations provided more third-party notice and hearing rights to a notice of violation than a consent order, a consent order still constituted

---

[5] There I conclude that the public notice and participation provisions under South Carolina law are comparable to those in § 1319(g).

26

commencement under Arkansas law. To the Eighth Circuit, courts must respect Arkansas' regulatory choice as to when the state agency's proceedings commenced. *See id.* at 379–80. The Arkansas regulation at issue did provide "certain" third-party notice and hearing procedures once the agency issued a consent order. But the court's decision was based on deference to the state's definition of commencement, not the public notice and participation characteristics of the regulation. *See id.* Deference here requires respecting South Carolina's decision that the Notice of Violation commenced the state's proceedings.

Next, the majority cites to the Eleventh Circuit's *McAbee* decision. But that decision explicitly declined to address commencement. 318 F.3d at 1251 n.6 ("The requirements of 'commencement' and 'diligent prosecution' are not at issue in this appeal."). And while the court suggested administrative consent orders might satisfy commencement, *see id.*, that dictum does not help define the outer limits of commencement.

In fact, *McAbee* warns against the majority's conflation of the commencement and comparability elements. The decision makes clear that "commencement," "diligent prosecution" and "comparability" are three separate elements in which the focus of comparability is state law, not commencement or action. *See id.* at 1251 ("If the AWPCA and the AEMA [the Alabama water pollution and environmental management statutes] are comparable to the federal CWA, then the district court should have granted summary judgment for the City if § 1319(g)(6)(A)(ii)'s commencement and diligent-prosecution requirements were both satisfied.").

Last, the majority points to the Seventh Circuit's decision in *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage District*, 382 F.3d 743 (7th Cir. 2004). In this

27

case, before the citizen suit was filed, the state agency negotiated a corrective action plan, formally referred the matter to the Wisconsin Department of Justice and filed stipulations. Despite that, the court determined that such actions "do not themselves qualify as the commencement of an administrative enforcement action that would serve to bar the plaintiffs' suit." *See id.* at 755–57. Instead, it "h[e]ld that for the purposes of § 1319(g), an administrative action 'commences' at the point when notice and public participation protections become available to the public and interested parties." *Id.* at 756.

While this case is the most helpful to the majority's analysis, important differences between South Carolina's and Wisconsin's environmental laws diminish that case's persuasive value. Essential to the *Friends of Milwaukee's Rivers* decision was the fact that the Wisconsin law lacked an administrative penalty proceeding "comparable" to § 1319(g) in the Clean Water Act; the state agency could only prosecute the case through courts. *See id.* at 756–57. Not South Carolina. Unlike in Wisconsin, not all Clean Water Act violations in South Carolina must go through court. South Carolina allows both lawsuits and administrative penalty proceedings. *See* DHEC, *Uniform Enforcement Policy*, *supra*, at § II.3 ("If the party fails . . . to respond adequately to the Notice of Violation, the Department may: (a) Seek relief through the courts by referral of the matter to the Legal Office; or, (b) Pursue the matter administratively."); S.C. Code Ann. § 48-1-50 ("The Department may: . . . (3) Make, revoke or modify orders requiring the discontinuance of the discharge . . . (4) Institute or cause to be instituted, in a court of competent jurisdiction, legal proceedings . . . .").

28

This difference matters. Because Wisconsin's law did not have administrative penalty proceedings, the Seventh Circuit could only analyze the state's enforcement policies by looking at when a lawsuit in court commenced. And of course, lawsuits formally start by filing a complaint. Because it is distinguishable from the facts here, *Friends of Milwaukee's Rivers* does not provide the support that the majority suggests.

c.

After discussing the characteristics of an action and comparing the public notice and participation features of South Carolina and federal law, the majority holds that DHEC's Notice of Violation did not bar Plaintiffs' citizen suit. It states that "we do not think [DHEC's] notice of alleged violation was enough to commence an action that was comparable to one brought under federal law." Maj. Op. 14. But its only real analysis here is to liken the Notice of Violation to an invitation or "a demand letter before civil litigation." *Id.*

Respectfully, those comparisons are unfair. No reasonable inquiry would view the Notice as a casual offer to engage in a voluntary discussion. As noted above, the Notice of Violation, at the risk of penalties, compelled Arabella Farm to attend the conference and address the specific accusations of violating South Carolina's environmental laws identified in the document. And DHEC's Notice of Violation is nothing like a demand letter. A demand letter is not required to commence civil litigation. In fact, many suits begin without any demand letter or advanced communication between parties. In contrast, Notices of Violation are, by virtue of DHEC's official policies, the first step in its enforcement process.

In short, the majority seems to brush aside the statutory authority under which DHEC issued the Notice, as well as the document's adversarial nature and substantive content. In doing so, the majority improperly concludes that DHEC had not yet "commenced" an "action" that is "comparable" to the federal statute addressing administrative penalties.

## B.

Next, I turn to the issue of diligent prosecution. "A CWA enforcement prosecution will ordinarily be considered 'diligent' if the judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so,' and . . . diligence is presumed." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008). "This presumption 'is due not only to the intended role of the [government] as the primary enforcer of the [CWA], but also to the fact that courts are not in the business of designing, constructing or maintaining sewage treatment systems.'" *Id.* (alterations in original) (quoting *Friends of Milwaukee's Rivers*, 382 F.3d at 760).

There is no serious argument that DHEC failed to diligently prosecute the enforcement proceedings. As Arabella Farm rightfully points out, DHEC "achieved the same results Plaintiffs allegedly seek," such as requiring Arabella Farm to obtain a stormwater permit, assessing impacts from any discharge and imposing civil penalties. *See* Resp. Br. 25. Further, under the consent order DHEC negotiated, DHEC will review Arabella Farm's various plans and reports pertaining to stormwater management, site

stabilization and stream assessment with enforcement authority should Arabella Farm fail to comply. *See id.* at 25–26.[6]

## C.

Last, I consider whether DHEC's administrative proceeding against Arabella Farm was "an action under a State law comparable to [§ 1319(g)]."

## 1.

To begin this analysis, we confront a tricky question of statutory interpretation. The statute says, "any violation . . . (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to [§ 1319(g)] . . . shall not be the subject of a civil penalty action." 33 U.S.C. § 1319(g)(6)(A). This language raises the question of whether "comparable" modifies "action" or "State law."

In my view, it is the state law that must be comparable.[7] Concluding otherwise would violate the nearest reasonable referent canon. *See* Scalia & Garner, *supra*, at 144–46 ("A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."). Consistent with that, our prior decisions indicate "comparable" describes "State law," not "action." *See, e.g.*, *United States v. Smithfield Foods, Inc.*, 191

---

[6] Plaintiffs do not even argue to the contrary. Instead, they contend diligent prosecution, like commencement, requires public notice and participation. This position muddles the distinct requirements of § 1319(g)(6)(A)(ii), as I have addressed in Section II.A.2. There is nothing in the provision suggesting that a diligent prosecution must involve public notice and participation.

[7] But even if it is the "action" that must be comparable, I do not see how that leads to a different result here. Whether one is comparing South Carolina law to § 1319(g) or an action under South Carolina law to an action under § 1319(g), the same factors outlined below would need to be considered.

F.3d 516, 525–26 (4th Cir. 1999) (finding that "Virginia's *enforcement scheme* is not sufficiently comparable to [§ 1319(g)]" and then declining "to address the issue of whether the Commonwealth was diligently prosecuting an administrative action" (emphasis added)); *Sierra Club*, 909 F.3d at 654 (discussing what would be required "for a *state law* to be comparable to [§ 1319(g)]" (emphasis added)).

2.

Having established that it is the state law that must be comparable to its federal counterpart, how do we analyze comparability? The Clean Water Act does not provide a standard for determining what would make a state law comparable to § 1319(g). But two approaches have emerged from our sister circuits.

One approach is the "overall comparability" test, adopted by the First and Eighth Circuits. Under this test, courts assess whether the "the overall regulatory scheme" is comparable, "even if the state law does not contain precisely the same" provision that would be found in the Clean Water Act. The state regulation is comparable "so long as the state law contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the [Act], provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests." *See Ark. Wildlife*, 29 F.3d at 381–82; *see also N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 556 (1st Cir. 1991) ("It is enough that the [state's scheme] . . . contains penalty assessment provisions comparable to the Federal Act, that the State is authorized to assess those penalties, and that the overall scheme of the two acts is aimed at correcting the same

32

violations, thereby achieving the same goals."), *overruled on other grounds by Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc.*, 32 F.4th 99 (1st Cir. 2022) (en banc).

The alternative approach is the "rough comparability" test, explicitly adopted by the Tenth and Eleventh Circuits and implicitly adopted by the Ninth Circuit. Under this test, "each category of state-law provisions—penalty assessment, public participation, and judicial review—must be roughly comparable to the corresponding class of federal provisions." *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1294 (10th Cir. 2005); *see also McAbee*, 318 F.3d at 1255–56 (discussing how this approach is preferable); *Citizens for a Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111, 1117–18 (9th Cir. 1996) (rejecting the First Circuit's decision of comparing "the state statutory enforcement scheme as a whole").

Our Circuit has not taken a position on this issue. The most relevant precedent, *Smithfield Foods*, found a Virginia enforcement scheme to not be sufficiently comparable to § 1319(g) by affirming the district court's reasoning that the state law "did not give the Commonwealth authority to assess administrative penalties without the violator's consent,[] and did not provide adequate procedures for notice and public participation." *See* 191 F.3d at 525–26. But the court did not specifically adopt one test over another.[8]

---

[8] The Fifth and Sixth Circuit cases also present a mixed bag. The Sixth Circuit framed the comparability issue as "if the overall State regulatory scheme afford[ed] . . . a meaningful opportunity to participate in the administrative enforcement process." *Jones v. City of Lakeland*, 224 F.3d 518, 523 (6th Cir. 2000). The Fifth Circuit found the notice and comment provisions of the Louisiana statute to be comparable to its Clean Water Act corollary, which arguably is a focused approach echoing the rough comparability analysis. But in doing so, the court cited to the First, Sixth and Eighth Circuit decisions. *See Lockett v. EPA*, 319 F.3d 678, 683–85 (5th Cir. 2003).

3.

But even under the more rigorous "rough comparability" approach—comparing South Carolina's penalty assessment, public participation and judicial review provisions with the corresponding class of federal provisions—South Carolina's enforcement mechanism is comparable to § 1319(g).

To explain why, I begin with two guiding principles in this analysis. First, comparable cannot mean identical. *See McAbee*, 318 F.3d at 1252 ("[T]he term 'comparable' means that the state law need only be sufficiently similar to the federal law, *not identical*." (emphasis in original) (quoting *Ark. Wildlife*, 29 F.3d at 381)). Second, the Clean Water Act's cooperative federalism framework welcomes different regulatory practices developed by the states. *See, e.g.*, *Sierra Club*, 909 F.3d at 647. And under such arrangement, citizen suits should not get in the way of the state's initiatives. *See Gwaltney*, 484 U.S. at 60; 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate [water] pollution . . . .").

With these principles in mind, I first look at South Carolina's public notice and participation provisions, which is the main contention presented by Plaintiffs. As an initial matter, South Carolina's administrative penalty enforcement process provides for public notice and participation. *See, e.g.*, S.C. Code Ann. §§ 30-4-80, 44-1-60, 48-1-150, 48-1-270 (discussing, respectively, "Notice of meetings of public bodies," "Appeals from department decisions giving rise to contested case," "Situations in which public hearing is

34

required or authorized," and "Availability of records, reports, and information to the public").

Plaintiffs maintain, however, that public notice and opportunities for public participation must come *before* any civil penalty order. They point out that, assuming DHEC and Arabella Farm strike a deal during the enforcement conference, DHEC may issue a consent order. *See* DHEC, *Uniform Enforcement Policy*, *supra*, at § IV.4.(b) ("If a determination is made as a result of the conference that a Consent Order can be mutually agreed to, the Department may issue such order."). And at least up to this point, there is no obvious public notice. From Plaintiffs' perspective, aside from the hypervigilant watchdogs who follow DHEC's every move (and could accordingly make any state FOIA requests to track documents, such as a Notice of Violation, in advance), the first time an average citizen would likely hear about the consent order will be when those orders are briefed at the DHEC Board meeting.

The problem with Plaintiffs' position is that § 1319(g)(4)(A), the relevant section of the Clean Water Act that addresses public notice and comment, and is thus the basis for our comparability analysis, does not impose a rigid requirement. It states that "[b]efore issuing an order assessing a civil penalty under this subsection the Administrator or Secretary, *as the case may be*, shall provide public notice of and *reasonable* opportunity to comment on the proposed issuance of such order." 33 U.S.C. § 1319(g)(4)(A) (emphases added).

Considering § 1319(g)(4)(A)'s text, DHEC's procedures are comparable. As discussed above, the Notice of Violation and other DHEC enforcement documents are

35

publicly available by request, and the DHEC Board must notify the public of all their meetings, including those that address administrative enforcements. These meetings are open to the public. S.C. Code Ann. § 30-4-60. But if that were not enough, South Carolina provides additional opportunities for public input. All administrative enforcement orders are summarily published in the DHEC Board's meeting minutes. *See* DHEC, *Uniform Enforcement Policy*, *supra*, at § IV.3 ("Reports on Consent and Administrative Orders issued each month by the Office of Environmental Quality Control shall be made to the Board."). Any interested party may request the DHEC Board to review an action the party disagrees with, which in turn could eventually lead to a South Carolina administrative law court proceeding. *See* S.C. Code Ann. § 44-1-60(B) to (G).

Thus, under South Carolina law, the opportunity for an interested party to request the Board to challenge the terms of the order—before a defendant must comply with it— exists. Even if this procedure is not what Plaintiffs view as optimal, South Carolina law provides a "reasonable opportunity" to comment on a consent order which is what § 1319(g)(4)(A) requires. The public is notified of such consent orders and has an opportunity to challenge them before the order truly affects the regulatory subject.

My conclusion is similar to the Tenth Circuit decision reached in *Paper*, 428 F.3d 1285. The Tenth Circuit held that Oklahoma's enforcement structure was comparable to EPA's—even though the laws did not "require notice of an assessment to anyone other than the violator." *See id.* at 1295. The Tenth Circuit ruled so because of the state's laws that guaranteed a right to an administrative hearing and the state's "Open Meetings Act"

36

which required public notice of all regular and special meetings. *See id.* at 1295–97. South Carolina's public notice/participation provisions are at least as robust as Oklahoma's.

The Tenth Circuit also relied on the fact that the EPA delegated to Oklahoma the authority to enforce the National Pollutant Discharge Elimination System ("NPDES"), since such delegation is permissible only if the state has adequate public participation procedures. *See id.* at 1296–97 ("Oklahoma's public-participation provisions are comparable enough to permit a delegation of CWA enforcement authority, and we conclude they should also be deemed comparable for the purposes of imposing the jurisdictional bar . . . ."); *see also* 40 C.F.R. § 123.27(d) (requiring the states to provide "intervention as of right in any civil or administrative action" and to "[p]ublish notice of and provide at least 30 days for public comment on any proposed settlement").

Just like in the Tenth Circuit's case, the EPA also approved South Carolina's enforcement mechanism. For a state to administer its own NPDES program, the state must have its program approved by the EPA. *See* 33 U.S.C. § 1342(b). This approval is no rubber stamp. The state must meet various requirements that are no less stringent than the federal program, such as the state having "adequate authority" to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1342(b)(7). And should the EPA decide upon periodic review that the state fails to meet the federal standard, the Agency "shall withdraw approval of such program." *See id.* § 1342(c)(3).

In the case of South Carolina, the EPA approved the state's program thirty years ago. *See* 40 Fed. Reg. 28,130 (July 3, 1975) (NPDES program); 57 Fed. Reg. 43,733 (Sept.

37

22, 1992) (general permits). That approval has survived periodic review as well. *See, e.g.*, EPA Region 4, *State Review Framework: South Carolina* (Dec. 11, 2019). Thus, like in *Paper*, the EPA's approval of South Carolina's standards bolsters Arabella Farm's argument that the South Carolina law is comparable to the EPA's public notice/participation procedures when it comes to administrative penalty actions.[9]

It may be true, as the majority points out, that the EPA's own regulations provide public notice and participation opportunities a bit earlier than what DHEC does. But the majority's reliance on these regulations is misplaced. Under the statute, we must compare the state law to "this subsection." 33 U.S.C. § 1319(g)(6)(A)(ii). "This subsection" refers to § 1319(g)—not a regulation made pursuant to § 1319(g). And the EPA regulations are not interpretive regulations that attempt to further define or clarify what § 1319(g) means. "[T]hey govern the EPA's own proceedings rather than those conducted under state law." Maj. Op. 12.

Ironically, the EPA's regulations would still not bar Plaintiffs' citizen suits because the advanced public notice does not occur soon enough. Under the EPA's regulations,

---

[9] The cases cited by Plaintiffs do not lead to a different result. Our Circuit's *Smithfield Foods* decision is distinguishable because that decision affirmed the district court's finding that the particular Virginia enforcement scheme at issue ("Special Orders") failed to provide public notice and participation opportunities at all. *See* 191 F.3d at 524–25 (citing 965 F. Supp. 769, 795 (E.D. Va. 1997)). And South Carolina's public notice and participation laws are more robust than those addressed by the Fifth, Sixth and Eleventh Circuits. *Cf. Stringer v. Town of Jonesboro*, 986 F.3d 502, 508 (5th Cir. 2021) (discussing the lack of periodic notice and right to an adjudicatory hearing in Louisiana); *Jones*, 224 F.3d at 523–24 (discussing Tennessee's laws, which do not include regular publication of the Board's meeting minutes or an opportunity for the Board to reconsider); *McAbee*, 318 F.3d at 1256 (discussing the inability for the public to participate at all in Alabama).

assessment of civil penalties pursuant to § 1319(g) could "commence" by filing an administrative "complaint." *See* 40 C.F.R. § 22.13(a); *see also id.* §§ 22.1(a)(6) (class II penalties), 22.50 (class I penalties).[10] And with respect to an administrative complaint, public notice is required "within 30 days following proof of service of the complaint." *See id.* § 22.45(b)(1). Thus, although the EPA's regulations say the Agency commences an action with the filing of the administrative complaint, the public notice that the majority and Plaintiffs insist is necessary to commence an action is not required until 30 days after service of that complaint. According to the majority's reasoning and Plaintiffs' theory, a citizen suit initiated after the EPA has filed an administrative complaint but prior to public notice would not be barred.

Having concluded that the public notice and participation opportunities that DHEC provides is comparable to § 1319(g), I also conclude that the other aspects of South Carolina's enforcement proceedings are likewise comparable. As for penalties, there is very little difference between the federal and state requirements concerning the penalty amounts and what the agencies must consider. *Compare* 33 U.S.C. § 1319(g)(2), (3) (amount and factors to consider), *with* S.C. Code Ann. § 48-1-330 (amount), *and* DHEC, *Uniform Enforcement Policy*, *supra*, at § III.A (factors to consider).

Finally, South Carolina's right to judicial review is broader than the Clean Water Act's corollary. *Compare* 33 U.S.C. § 1319(g)(8) (providing judicial review to "[a]ny

---

[10] Alternatively, if the parties agree to settle before the filing of such complaint, "a proceeding may be simultaneously commenced and concluded by the issuance of a consent agreement and final order" (the final order being issued by either EPA's regional office or the Environmental Appeals Board). *See* 40 C.F.R. §§ 22.13(b), 22.18(b)(2), (3).

person against whom a civil penalty is assessed under this subsection or who commented on the proposed assessment of such penalty"), *with* S.C. Code Ann. § 48-1-200 ("Any person may appeal from any order of the Department within thirty days after the filing of the order, to the court of common pleas of any county in which the pollution occurs."), *and* S.C. Code Ann. § 1-23-380 (providing judicial review to those "who ha[ve] exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case").

For these reasons, even under the more rigorous rough comparability test, DHEC's administrative penalty proceedings are comparable to § 1319(g).

D.

By issuing the Notice of Violation, DHEC commenced and was diligently prosecuting an action under state law comparable to § 1319(g). On that ground, I would affirm the district court's dismissal of Plaintiffs' claims for monetary penalties.[11]

III.

My conclusion on the citizen suit bar leaves open one additional point raised by Plaintiffs. They claim that even if South Carolina "has commenced and is diligently

---

[11] The majority also concludes that Plaintiffs satisfied the citizen suit notice requirements under 33 U.S.C. § 1365(b)(1)(A), even though "Trout Unlimited," the entity listed in the notice letter, is distinct from "South Carolina Trout Unlimited," one of the named Plaintiffs. *See* J.A. 63. I am not so sure. While the individual responsible for contact may have been the same, these two entities are legally distinct organizations, not just interchangeable names. Making things less clear, there is more than one chapter of Trout Unlimited in the upstate of South Carolina. But since I consider 33 U.S.C. § 1319(g)(6) to bar all Plaintiffs' monetary penalty claims, I need not decide on the notice issue.

prosecuting an action under a State law comparable to [§ 1319(g)]," such action does not bar the part of the citizen suit that seeks injunctive relief. This is because, according to Plaintiffs, § 1319(g)(6)(A) specifically bars only "civil penalty action[s]," not civil actions generally. As argued by Plaintiffs, the former is limited to a proceeding seeking monetary penalties and does not include claims for injunctive relief. And since Plaintiffs also seek injunctive relief, they insist the injunctive portion of the lawsuit should survive.

## A.

Our sister circuits are split as to whether 33 U.S.C. § 1319(g)(6)(A)'s citizen suit bar includes a bar on actions that seek injunctions. The Eighth Circuit in *Arkansas Wildlife* concluded that any bifurcation in the citizen suit bar would be "unreasonable" since a citizen suit "could result in undue interference with, or unnecessary duplication of, the legitimate efforts of the state agency." 29 F.3d at 383. The Tenth Circuit in *Paper* disagreed, focusing on the text of the statute and holding that 33 U.S.C. § 1319(g)(6)(A) has no bearing on injunctions. 428 F.3d at 1299. The First Circuit has recently spoken too. In *Blackstone Headwaters*, 32 F.4th 99, the First Circuit reached the same result as the Tenth Circuit. In doing so, the First Circuit overruled its prior decision in *Scituate*, 949 F.2d at 558, which had held that the preservation of injunctive relief notwithstanding 33 U.S.C. § 1319(g)(6) would be "absurd."

While the Eighth Circuit's reasoning may have some logical appeal, the text of the Clean Water Act itself supports the First and Tenth Circuits' position. The main statute governing citizen suits, § 1365(a), permits a "civil action" "[e]xcept as provided in" § 1365(b) (notice requirements) and § 1319(g)(6). *See* 33 U.S.C. § 1365(a). And when one

41

looks at § 1319(g)(6), that provision only refers to "civil penalty action." *See id.* § 1319(g)(6). In statutory interpretation, we have a "duty to give each word some operative effect where possible." *Duncan v. Walker*, 533 U.S. 167, 175 (2001) (internal quotation omitted); *see also* Scalia & Garner, *supra*, at 170–74 ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.").

A deeper inquiry into § 1365(a) also makes a distinction between penalties and an injunction clear. "The district courts shall have jurisdiction . . . to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title." 33 U.S.C. § 1365(a). Breaking this text down into the various orders that the district court has jurisdiction over, on the one hand there are orders to enforce an effluent standard or limitation and relatedly to perform such acts/duties. These types of orders are akin to an injunction. On the other hand, there are orders to apply any appropriate civil penalties. These types of orders primarily concern damages. Since § 1365(a) allows for orders for injunctive relief and for civil penalties, and § 1319(g)(6) only mentions civil penalties, I would not broaden the scope of the citizen suit bar beyond the text.

33 U.S.C. § 1319 bolsters the above distinction. Under § 1319(b), "[t]he Administrator is authorized to commence a *civil action* for appropriate relief, *including a permanent or temporary injunction*, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section." *Id.* § 1319(b) (emphases added). In contrast, § 1319(d) separately authorizes "civil penalties." Then, § 1319(g)(6)(A) bars civil

penalty actions "under subsection (d) of this section," without reference to § 1319(b)'s authorization of injunctive relief. Any way you slice it, the text goes against Arabella Farm.

Accordingly, a state administrative penalty action does not bar a citizen suit to the extent it seeks an injunction. *Cf. Paper*, 428 F.3d at 1300 ("[T]he jurisdictional bar in 33 U.S.C. § 1319(g)(6)(A)(ii) does not apply to equitable relief . . . ."). I would vacate the district court's dismissal of Plaintiffs' injunctive claims.

B.

Even so, an injunctive relief seems questionable in a citizen suit when a state has commenced, and is diligently prosecuting, an action under state law comparable to § 1319(g). "An injunction is an equitable remedy that 'does not follow from success on the merits as a matter of course.'" *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (quoting *Winter v. NRDC*, 555 U.S. 7, 32 (2008)). To prevail on the merits of an injunction, the plaintiff must meet the four factors below:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "Satisfying these four factors is a high bar, as it should be." *SAS*, 874 F.3d at 385. Because "[a]n injunction is a drastic and extraordinary remedy" which "risks awarding more relief than is merited," a plaintiff must "meet a heavy burden before being granted injunctive relief." *See id.* (alteration in original) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

43

That burden is even greater when a state agency, like DHEC here, has stepped in and diligently prosecuted the matter. State enforcement efforts inevitably tradeoff between environmental protection and other state government priorities. As just one example, states often must consider conservation along with economic development. When a state agency is the delegated authority to enforce the Clean Water Act through the state's laws and regulations and has—after weighing the various interests and hardships involved—decided to take particular measures to address the harms caused by the violator, we must defer to that decision. Failing to do so upsets the balance of interests that states must strike.

As we said in *Piney Run*, state agencies are the primary enforcers of the Clean Water Act, not the courts. 523 F.3d at 459–60. And if courts grant injunctive relief in citizen suits when a state agency is diligently prosecuting environmental law violations, "the public interest would be curtailed considerably." *Id.*; *cf. Paolino v. JF Realty, LLC*, 830 F.3d 8, 16 (1st Cir. 2016) (concluding that the Rhode Island agency's ongoing involvement of the property, responsiveness to the complaints/concerns, and resolution of the issue "vitiat[e] the premise that a citizen suit is necessary at all").

The Supreme Court's *Gwaltney* decision is consistent with this view. After emphasizing that citizen suits are "meant to supplement rather than to supplant" government enforcements, the Supreme Court discussed the negative consequences should this maxim not be followed:

> Suppose that the [EPA] Administrator identified a violator of the Act and issued a compliance order under [§ 1319(a)]. Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would

44

not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

484 U.S. at 60–61. I agree. In fact, granting injunctive relief in citizen suits under circumstances like those here and in *Gwaltney* would permit the tail—citizen suits—to wag the dog—state enforcement of environmental laws.

None of this is to say that citizen suits do not have a proper role in the enforcement of environmental laws. Congress has made clear that they do. But that role exists when the state or federal agency is not doing enough. *See id.* at 62. In contrast, satisfying 33 U.S.C. § 1319(g)(6)(A)(ii) necessarily implies the state's prosecution was "diligent" and "comparable" to the federal standard. If that is the case, I do not see how an injunction—which by its nature is telling the agency it was not doing enough—would be justified.

Because I would vacate the portion of the district court's order that concludes 33 U.S.C. § 1319(6)(A)(ii) bars claims for injunctive relief, I would remand that issue to the district court to consider the merits of the injunction claim.

## IV.

Environmental law has been, and always will be, a delicate balance between various competing interests.[12] The Clean Water Act is no exception. Thus, while citizen suits play

---

[12] *See generally* Richard J. Lazarus, *The Making of Environmental Law* 24–42 (2004).

an integral role in protecting our nation's waters, the Act also sets clear limits on when private citizens can step in instead of the government. By determining that DHEC had not commenced an administrative penalty action prior to the citizen suit, the majority broadens the scope of when citizen suits are permissible, overriding the delicate balance that Congress established under the Act.

I respectfully dissent.